**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JEFF BRUNECZ and JULIE ANN CHAPMAN, Individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WARREN GENERAL HOSPITAL,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Docket No. 1:24-cv-00203-SPB

JURY TRIAL DEMANDED

## PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, JEFF BRUNECZ and JULIE ANN CHAPMAN, Individually, and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant, WARREN GENERAL HOSPITAL, (hereinafter, "WGH") and allege, upon personal knowledge as to his own actions, and upon information and belief as to all other matters, as follows.

### INTRODUCTION

1.    Plaintiffs bring this class action to address Defendant's improper practice of disclosing the confidential Personally Identifying Information ("PII")[1] and/or Protected Health Information ("PHI")[2] (collectively referred to as "Private Information") of Plaintiffs and the

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and

proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"),[3] Google, LLC ("Google"), Microsoft, DoubleClick, StackAdapt, Hotjar, Salesforce CrazyEgg, and potentially others ("the Disclosure") via tracking technologies used on its website.

2.      The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[4] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[5] OCR and FTC warn that "[i]mpermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation,

---

prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). WGH is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

[3] Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. in October 2021. Plaintiff's reference to both "Facebook" and "Meta" throughout this complaint refer to the same company.

[4] *Use of Online Tracking Technologies*, U.S. DEP'T OF HEALTH & HUMAN SERVICES (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited June 10, 2024), **attached as Exhibit A.**

[5] *Id.*

health, or physical safety of the individual or to others."[6]

3.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.    Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

5.    WGH is an independent nonprofit hospital located in Warren, Pennsylvania. According to WGH, it "is widely regarded as the best hospital in the area due to its exceptional medical care and patient-centered approach" and it "provides patients with access to a wide range of medical services, including emergency care, surgery, rehabilitation, and specialized treatments.".[7]

6.    Despite its unique position as a trusted healthcare provider, WGH knowingly

---

[6] *Use of Online Tracking Technologies*, U.S. DEP'T OF HEALTH & HUMAN SERVICES (July 20, 2023), **Exhibit A.**
[7] *See* https://www.wgh.org/about (last visited June 10, 2024).

configured and implemented into its website, https://www.wgh.org/ (the "Website") code-based tracking devices known as "pixels" (also referred to as "trackers" or "tracking technologies"), which collected and transmitted patients' Private Information to Facebook and other third parties, without patients' knowledge or authorization.

7.    Defendant encourages patients to use its Website, along with its various web-based tools and services (collectively, the "Online Platforms"), to learn about WGH on its main homepage,[8] to search for services, health information, and research medical conditions,[9] to search for physicians,[10] to make payments,[11] to find out pertinent information on the hospital such as the visitation policy,[12] and to access a patient portal.[13] .

8.    When Plaintiffs and Class Members used Defendant's Website and Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded pixels from Facebook, and others into its Website and Online Platforms, surreptitiously forcing Plaintiffs and Class Members to transmit intimate details about their medical treatment to third parties without their consent.

9.    A pixel (also referred to as a "tracker" or "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[14] When a person visits a website with an embedded pixel, the pixel tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information

---

[8] *See* https://www.wgh.org/about (last visited June 10, 2024).
[9] *See* https://www.wgh.org/our-services (last visited June 10, 2024).
[10] *See* https://www.wgh.org/find-a-provider (last visited June 10, 2024).
[11] *See* https://ctsv3x.ipayxepay.net/wgh/pp_P8000_F1_standard.jsp (last visited June 10, 2024).
[12] *See* https://www.wgh.org/visitor-guide (last visited June 10, 2024).
[13] *See* https://www.wgh.org/portal (last visited June 10, 2024).
[14] *See Meta Pixel*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last visited June 10, 2024).

submitted.[15] Then, the pixel transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[16]

10.    Among the trackers Defendant embedded into its Website is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a visitor's device, including their IP address, and the pages viewed.[17] When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[18] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[19]

11.    Operating as designed and as implemented by WGH, the Meta Pixel allowed WGH to unlawfully disclose Plaintiff and Class Members' Private Health Information alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

12.    Facebook encourages and recommends use of its Conversions Application

---

[15] *See Conversion Tracking*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited June 10, 2024).

[16] *Id.*

[17] *See Get Started*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited June 10, 2024).

[18] *See Conversion Tracking*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited June 10, 2024).

[19] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited June 10, 2024).

Programming Interface ("CAPI") alongside use of the Meta Pixel.[20]

13.    Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers.[21, 22]

14.    Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[23]

15.    Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly.

16.    WGH utilized data from these trackers to market its services and bolster its profits. Meta Pixel and CAPI are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiffs' and

---

[20] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).
[21] Reggie Paquette, *What is the Facebook Conversion API and How to Use It*, REVEALBOT BLOG (March 5, 2021) https://revealbot.com/blog/facebook-conversions-api/
[22] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." *Conversions API*, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited June 10, 2024).
[23] *About Conversions API*, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965 (last visited June 10, 2024).

Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

17.     The information that Defendant's Meta Pixel and possibly CAPI sent to Facebook can include the Private Information that Plaintiffs and Class Members submitted to WGH's Website, including, for example, content that users viewed, users' searches, and users' patient related activities, including the pages they visited, and the buttons that they clicked, when they made an appointment, as well as their identifying information.

18.     Such information allows a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiffs' and Class Members' Private Information to third-party marketers, who then geotarget Plaintiffs and Class Members' Facebook pages based on communications obtained via the Meta Pixel and CAPI. Facebook and any third-party purchasers of Plaintiffs' and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

19.     In addition to the Facebook tracker and CAPI, on information and belief, WGH installed other tracking technology which operate similarly to the Meta Pixel and transmit a website user's Private Information to other third parties.

20.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send Personal Health Information or other confidential medical information collected via its webpages to a hidden third party—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without the patients' consent.

21.     Neither Plaintiffs nor any Class Member signed a written authorization permitting WGH to send their Private Information to Facebook, or any other third parties uninvolved in their

treatment.

22.     Despite willfully and intentionally incorporating tracking technology, including the Meta Pixel, potentially CAPI, and other tracking technology, into its Website and servers, WGH has never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications and Private Information with third parties including Facebook, and others.

23.     WGH further made express and implied promises to protect Plaintiffs' and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with WGH, including in its privacy policies and elsewhere.

24.     Defendant owed common law, statutory, and regulatory duties to keep Plaintiffs' and Class Members' communications and Private Information safe, secure, and confidential.

25.     Upon information and belief, WGH utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

26.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

27.     WGH breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*,: (i) failing to adequately review its marketing programs and web based technology to ensure the hospital Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiffs and Class Members; (iv) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Facebook and others; (v) failing to protect Private Information

and take steps to block the transmission of Plaintiffs' and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiffs and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

28.    Plaintiffs seek to remedy these harms and bring causes of action for (I) Negligence,(II) Invasion of Privacy-Intrusion Upon Seclusion; (III) Invasion of Privacy-Public Disclosure of Private Facts; (IV) Breach of Implied Contract; (V) Unjust Enrichment; (VI) Breach of Fiduciary Duty; (VII) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 20101, et seq. ("UTPCPL"); and (VIII) violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701, et seq., ("WESCA").

## PARTIES

29.    Plaintiff, JEFF BRUNECZ, is a natural person and a resident and citizen of the State of Pennsylvania where he intends to remain, with a principal residence in Sheffield, Pennsylvania, in Warren County. He is a patient of WGH and a victim of WGH's unauthorized Disclosure of Private Information.

30.    Plaintiff, JULIE ANN CHAPMAN, is a natural person and a resident and citizen of the State of Pennsylvania where she intends to remain, with a principal residence in Wilcox, Pennsylvania, in Elk County. She was a patient of WGH and a victim of WGH's unauthorized Disclosure of Private Information.

31.    Defendant, **Warren General Hospital**, is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 2 Crescent Park, Warren, Pennsylvania 16365 in Warren County.

## JURISDICTION & VENUE

32.    This Court has jurisdiction over the subject matter of this action pursuant to 42 Pa. Cons. Stat. § 931.

33.    This Court has personal jurisdiction over Defendant pursuant to 42 Pa. Cons. Stat. § 5301, because Defendant carries on a continuous and systematic part of its general business within this Commonwealth and maintains a principal place of business herein.

34.    Venue is appropriate in this Court under 231 Pa. Code § 2179, because Defendant's principal places of business is in Warren County.

## COMMON FACTUAL ALLEGATIONS

### A. Background

35.    Founded in 1898 and headquartered in Warren, Pennsylvania,[24] WGH is "widely regarded as the best hospital in the area due to its exceptional medical care and patient-centered approach. The hospital boasts state-of-the-art facilities and equipment, staffed by highly skilled and compassionate medical professionals.[25]

36.    WGH generates approximately $211 million in annual revenue and employs 530 people."[26]

37.    WGH provides medical services including behavioral health, cancer care, detoxification, emergency care, eye care, family medicine, general surgery, imaging, maternity, OB/women's care, orthopedics, pediatrics, pharmacy, rehabilitation, and urology.[27]

38.    WGH serves many of its patients via its Online Platforms, which it encourages patients to use to find healthcare services and providers, access information about specific health

---

[24] *See* https://www.wgh.org/history (last visited June 10, 2024).
[25] *See* https://www.wgh.org/about (last visited June 10, 2024).
[26] *See* https://www.zippia.com/warren-general-hospital-careers-44040/# (last visited June 10, 2024).
[27] *See* generally https://www.wgh.org/our-services (last visited June 10, 2024).

conditions, schedule appointments, and more.[28]

39.    Regarding its patient portal, WGH states: "MyPortal is a secure, private web portal that allows you to access your health information online. Updating your personal information, checking on your visit history, account balances and your scheduled appointments is all available in one place."[29]

40.    In furtherance of its goal of increasing sales and profitability, and to improve the success of its advertising and marketing, WGH purposely installed the Meta Pixel and other trackers onto its Website, for the purpose of gathering information about Plaintiffs and Class Members to further its marketing efforts. But WGH did not only generate information for its own use: it also shared patient information, including Private Information belonging to Plaintiffs and Class Members, with Facebook and other unauthorized third parties.

41.    To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

### i.    Facebook's Business Tools and the Meta Pixel

42.    Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[30]

43.    In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

44.    Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits

---

[28] *Id.*

[29] *See* https://myportal.wgh.org:8686/ptaccess/LearnMore.aspx (last visited June 10, 2024).

[30] *Meta Reports Fourth Quarter and Full Year 2021 Results*, FACEBOOK https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited June 10, 2024).

of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

45.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, the webpage's Universal Resource Locator ("URL"), as well as metadata, button clicks, and other information.[31] Businesses that want to target customers and advertise their services, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[32]

46.     One such Business Tool is the Meta Pixel, a tool that "tracks the people and type of actions they take."[33] When a user accesses a webpage that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling from the user's browser to Facebook's server.

47.     Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy (such as the homepage) and disable it on pages that do implicate patient privacy.

48.     The Meta Pixel's primary purpose is for marketing and ad targeting and sales generation.[34]

49.     Facebook's own website informs companies that "[t]she Meta Pixel is a piece of

---

[31] *Specifications for Facebook Pixel Standard Events,* META, https://www.facebook.com/business/help/402791146561655 (last visited Jan. 31, 2023); *see also Facebook Pixel, Accurate Event Tracking, Advanced,* META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; *see* also Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; *App Events API*, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited June 10, 2024).
[32] *About Standard and Custom Website Events*, META, https://www.facebook.com/business/help/964258670337005; *see* also Facebook, App Events API, *supra*.
[33] *Retargeting*, META, https://www.facebook.com/business/goals/retargeting.
[34] *See Meta Pixel*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last visited June 10, 2024).

code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[35]

50.    According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** (emphasis added).

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[36]

51.    Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.

- **Drive more sales**. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[37]

52.    Facebook likewise benefits from the data received from the Meta Pixel and uses the

---

[35] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153 (last visited June 10, 2024).
[36] *Meta Pixel*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last visited June 10, 2024).
[37] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153 (last visited June 10, 2024).

data to serve targeted ads and identify users to be included in such targeted ads.

   ii.   ***Defendant's method of transmitting Plaintiffs' and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel***

53.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

54.    Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

55.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[38]

56.    GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

57.    When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information (such as Defendant's "Find a Physician" page). The entity's servers send the HTTP Response, which

---

[38]"Cookies are small files of information that a web server generates and sends to a web browser . . .Cookies help inform websites about the user, enabling the websites to personalize the user experience." *What are Cookies?* CLOUDFARE, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited June 10, 2024).

contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

58.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

59.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

60.     WGH's implementation of the Meta Pixel is source code that acted much like a traditional wiretap, intercepting and transmitting communications intended only for WGH.

61.     Separate from the Meta Pixel, Facebook and other website owners can place third-party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as she moves around the internet—whether on the cookie owner's website or not. Facebook uses this type of third-party cookie when Facebook account holders use the Facebook app or website. As a result, when a Facebook account holder uses Defendant's Website, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the patient associated with the Private Information it has intercepted.

62.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. To counteract this, third parties bent on gathering data and Private Information implement workarounds that are difficult to detect or evade. Facebook's workaround is its Conversions API tool, which is particularly effective because the

data transmitted via this tool does not rely on the website visitor's web browsers. Rather, the information travels directly from the entity's server to Facebook's server.

63.    Conversions API "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[39] Thus, the entity receives and stores its communications with patients on its server before Conversions API collects and sends those communications—and the Private Information contained therein—to Facebook.

64.    Notably, client devices do not have access to host servers and thus cannot prevent (or even detect) this additional transmission of information to Facebook.

65.    While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the host server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."[40] Thus, if an entity implemented the Meta Pixel in accordance with Facebook's documentation, it is also reasonable to infer that it implemented the Conversions API tool on its Website.

66.    The third parties to whom a website transmits data through pixels and other tracking technology do not provide any substantive content on the host website. In other words, Facebook and others like it are not providing anything to the user relating to the user's communications. Instead, these third parties are typically procured to track user data and communications only to serve the marketing purposes of the website owner (i.e., to bolster profits).

---

[39] *About Conversions API,* META, https://www.facebook.com/business/help/2041148702652965 (last visited June 10, 2024).
[40] *See Best Practices for Conversions API*, META, https://www.facebook.com/business/help/308855623839366 (last visited June 10, 2024).

67.     Accordingly, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer its patients' computing devices, causing the device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Facebook.

68.     In this case, WGH employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

69.     Consequently, when Plaintiffs and Class Members visited WGH's Website and communicated their Private Information, it was simultaneously intercepted and transmitted to Facebook.

70.     On information and belief, WGH also employed other trackers, which likewise transmitted Plaintiffs' and the Class Members' Private Information to third parties without Plaintiffs' and Class Members' knowledge or authorization.

### iii.     Defendant Violated its own Privacy Policies

71.     WGH maintains and is covered under privacy policies, including a Notice of Privacy Practices [41] which is posted on Defendant's Website (collectively, "Privacy Policies").

72.     Defendant's Notice of Privacy Practices states:

**You have the right to:**
. . .
- Privacy concerning your own medical care. Case discussion, consultation, examination and treatment should be done in places designed to protect your privacy.

- Have all records pertaining to your medical care treated as confidential. If you request it, the hospital shall provide you access to your medical records unless

---

[41] *Notice of Privacy Practices*, Warren General Hospital (2023), https://www.wgh.org/patients-rights-respon-and-privacy (last visited June 10, 2024), attached as **Exhibit B**.

restricted for medical or legal reasons. You will have access to your records within a reasonable time and for a reasonable fee.

**Your protected health care information is used or may be disclosed for purposes of treatment, payment, and operations to:**

- Other health care professionals or providers for the purpose of providing you with quality health care. (Example: Another hospital, a nursing home, home health agency, or consults or referrals between physicians or reference laboratories.)

- Your insurance provider for the purpose of receiving payment for your needed health care services.

- Health care professionals for the purposes of ensuring we are providing quality health care services. (Example: Our quality assurance committee reviews patient records to monitor performance and quality.)

- Business associates who perform services such as billing, coding, consulting, transcription, and accounts receivable management.

- Training, certification, and licensing programs. (Example: Medical students and nursing students participate in training programs at WGH.)

- Customer service staff, medical or legal reviews, and auditors. (Example: Patients receive a questionnaire about the service they received and these are used to improve our service to you.

- Public health or law enforcement when the law requires it.

- State or federal agencies for purposes of health care cost containment, determining medical necessity, or appropriateness of services.

- Report a defective device or problematic event regarding a biological product (food or medication). (Example: The FDA requires reporting of defective equipment).

- Send you appointment reminders, treatment alternatives, or information regarding other health related benefits and services.

- Visitors, callers, clergy, and room deliveries, if you agree to be in our hospital directory and these people ask for you by name.

- Other situations where Warren General Hospital may use or disclose your protected health information include: health workers compensation, coroners,

18

medical examiners, and funeral directors." [42]

73.     None of the above purposes enumerated in WGH's Privacy Policies permit Defendant to disclose patients' PHI/Private Information to third-parties uninvolved in their treatment for marketing purposes, without their written authorization.

74.     Further still, WGH promises: *"[n]ormally, we will require your signed authorization before disclosing your medical information outside the hospital*, unless it is required by law. You may revoke your permission to release confidential information at any time. The hospital abides by the terms of this notice. The hospital may make changes to the Privacy Notice. Changes will be effective for all protected health information kept by the hospital. The revised Privacy Notice will be available at the point of service. Notice Effective: May 18, 2012"[43]

75.     WGH fails to notify Website users and patients that it utilizes the Meta Pixel and other tracking technologies to disclose Private Information to third parties such as Facebook for marketing purposes without their consent.

76.     Despite these express, specific representations and promises, WGH does indeed transfer Private Information to third parties. Using the Meta Pixel, Defendant used and disclosed Plaintiffs' and Class Member's Private Information and confidential communications to Facebook, and other unauthorized third parties, without written authorization, in violation of their Privacy Policies.

77.     Despite these express, specific representations and promises, WGH does indeed transfer Private Information to third parties. Using the Meta Pixel, Defendant used and disclosed

---

[42] *Id*. (bold in original)
[43] *Id*. (emphasis added)

Plaintiffs' and Class Member's Private Information and confidential communications to Facebook, and likely other unauthorized third parties, without written authorization, and in violation of its Privacy Policies.

### iv. *WGH Unauthorizedly Disclosed Plaintiffs' and the Class's Private Information*

78.   WGH does not presently install any trackers but WGH previously installed Google Analytics with Google Tag Manager and a Meta Pixel to disclose Plaintiffs' and Class Members' Private Information and confidential communications to third parties for marketing purposes, including Facebook and Google.

79.   WGH first installed a Google Analytics tracker with ID UA-87418034-1 ("UA1") as early as November 23, 2016. WGH connected its Google Analytics tracker with Google Tag Manager around May 2018. WGH continued to install UA1 until at least as recently as February 1, 2023.



80.    Beginning no later than January 2, 2024, WGH installed a Meta Pixel with ID 1070757134372217 ("Pixel1").



81.    WGH continued to install Pixel1 until at least as recently as April 5, 2024.



82.     Accordingly, WGH disclosed its patients' data to Google from at least as early as November 23, 2016 through as recently as February 1, 2023 and to Facebook from at least as early as January 2, 2024 through as recently as April 5, 2024.

83.     WGH disclosed patient data to Facebook as soon as a patient loaded its homepage, whereupon WGH would send PageView and ViewContent events to Facebook disclosing that the user was on the page, https://www.wgh.org/.



84.    As patients navigated from the homepage to the rest of the website, WGH continued to disclose information about its patients' activities, revealing patients' potential: (i) medical concerns and (ii) patient status.

85.    In each of the Meta Pixel events that WGH sends to Facebook, WGH includes the "c_user" cookie, which Facebook uses to identify WGH patients. Facebook can therefore connect cookie data that WGH transmits with specific patients. Furthermore, Facebook's "Your activity off Meta technologies" report confirms that Facebook receives the data WGH shares with Facebook.





***WGH Disclosed Patients' PHI***

86.    WGH shared information about patients' browsing activities that revealed patients' potential medical conditions and/or health concerns.

87.    For example, if a patient searched for a cancer care provider, WGH would disclose this to Facebook via SubscribedButtonClick and PageView events.

88.    As soon as a patient clicked the "FIND A PROVIDER" button, WGH would send Facebook a SubscribedButtonClick event revealing the user's click.



89.    The event reveals what page the user was on when they clicked the button. For instance, if a patient clicked to find a provider while they were browsing the Women's Healthcare page the "rl" parameter would inform Facebook the user was viewing "womens-healthcare" when they decided to find a provider.



90.     As the medical provider directory page loaded, WGH would transmit a PageView event informing Facebook that the patient was viewing the "find-a-provider" page. If the patient then selected to search for Cancer Care, WGH would send another PageView event, revealing the patient was viewing the "list-of-providers" for the "category/Cancer+Care."

91.     If the patient then clicked to view a Cancer Care physician, WGH would send a PageView event providing Facebook with the doctor's name and indicating that the patient was searching for cancer care physicians.



92.     WGH also disclosed as patients learned about services WGH offers.

93.     When a patient loaded the "our-services" page, WGH would inform Facebook via a PageView event.

94.     Likewise, when a patient selected a service from the Our Services page, WGH would inform Facebook about this too. For example, if the patient clicked to learn about cancer care, WGH would send a SubscribedButtonClick event providing that the patient clicked "CANCER CARE" on the "OUR SERVICES – Warren General Hospital."



95.    Then, as the Cancer Care page loaded, WGH would follow up with a PageView event confirming that the patient was viewing the "cancer-care" page.

96.    WGH would also inform Facebook when patients browsed WGH's events and about which events patients were interested in. First, WGH would send a PageView event as a patient navigated to the "events" page.

97.    Then, when the patient viewed an event, WGH would send another PageView event. For instance, if the patient viewed the Screw Cancer Festival and Fundraiser, the PageView event would disclose that the patient was on the "screw-cancer-festival-and-fundraiser" page.



***WGH Disclosed Patient Status***

98.    WGH also disclosed activities that potentially reveal a website user's status as a WGH patient.

99.    For example, if a patient wanted to download a medical records authorization form,

WGH would send Facebook a PageView event revealing that the patient was on the "medical-records" page.



100.    Similarly, WGH would disclose to Facebook when a patient viewed the "contact" page. If the patient clicked to call WGH from this page, WGH would send a SubscribedButtonClick event informing Facebook that the patient clicked to call "+18147234973" from the "Contact – Warren General Hospital."

101.    WGH would also inform when patients navigated to pay their bills. For example, WGH would transmit a SubscribedButtonClick event revealing when a patient clicked to "PAY A BILL" at "Warren General Hospital."



102.    Finally, WGH would also reveal which patients clicked to access the patient portal. The disclosures would begin when a patient clicked the "PATIENT PORTAL" button and WGH sent a SubscribedButtonClick event.

103.    As the pre-portal page loaded, WGH would send a PageView event confirming the

patient navigated to the "www.whg.org/portal" page.



104.    From this page patients can either navigate to the old portal or new portal login page. WGH would reveal users' selection via SubscribedButtonClick events. The events would indicate that the patient clicked "VISIT OUR OLD PORTAL" or "VISIT OUR NEW PORTAL" from the "Portal – Warren General Hospital" page.

105.    Google and other companies process data in a similar manner and use it to build marketing and other data profiles allowing for targeted advertising.

106.    WGH could have chosen not to use the Meta Pixel, or it could have configured it to limit the information that it communicated to third parties, but it did not. Instead, it intentionally selected and took advantage of the features and functionality of the Pixel that resulted in the Disclosure of Plaintiffs' and Class Members' Private Information.

107.    Along those same lines, WGH could have chosen not to use other tracking technologies such as Google Analytics with Google Tag Manager ("GTM"), to track Plaintiffs' and Class Members' private communications and transmit that information to unauthorized third

parties. It did so anyway, intentionally taking advantage of these trackers despite the harm to Plaintiffs' and Class Members' privacy.

108.    WGH used and disclosed Plaintiffs' and Class Members' Private Information to Facebook and Google, and possibly other third parties, for the purpose of marketing its services and increasing its profits.

109.    On information and belief, WGH shared, traded, or sold Plaintiffs' and Class Members' Private Information with Facebook, and potentially other third parties, in exchange for improved targeting and marketing services.

110.    Plaintiffs and the proposed Class Members never consented, agreed, authorized, or otherwise permitted Defendant WGH to intercept their communications or to use or disclose their Private Information for marketing purposes. Plaintiffs and the Class Members were never provided with any written notice that WGH disclosed its patients' Protected Health Information to Facebook and Google, and others, nor were they provided any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed their Private Information including PHI and PII to unauthorized entities.

111.    Plaintiffs and Class Members relied on WGH to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

112.    Furthermore, WGH actively misrepresented that it would preserve the security and privacy of Plaintiffs' and Class Members' Private Information. In actuality, WGH shared data about Plaintiffs' and Class Members' activities on the Online Platforms alongside identifying details about the Plaintiffs and Class Members, such as their IP addresses.

113.    By law, Plaintiffs and the Class Members are entitled to privacy in their Protected

Health Information and confidential communications. WGH deprived Plaintiffs and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential communications, Personally Identifiable Information, and Protected Health Information; (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook and possibly others; and (3) undertook this pattern of conduct without notifying Plaintiffs and Class Members and without obtaining their express written consent.

**B.  Plaintiff Jeff Brunecz's Experience**

114.    Plaintiff Jeff Brunecz ("Plaintiff Brunecz") has been a patient at WGH since 2012, receiving healthcare services from WGH for medical conditions including treatment of a hernia, a colon procedure, and primary care.

115.    Plaintiff Brunecz relied on WGH's Website and Online Platforms to communicate confidential Private Information to Defendant. beginning in 2012, and last on or around July 2023, including: searches for treatments and medical information, topics related to finding a doctor for hernia treatment, scheduling appointments, searching for treatment information, and paying for treatment.

116.    After Plaintiff Brunecz used the Online Platforms, to schedule appointments, to search for treatment information, doctors, to pay for medical services, to research treatments, to use the Patient Portal, and to look for a doctor for a colonoscopy, his Facebook feed was immediately bombarded with advertisements for "Cologuard."

117.    Plaintiff Brunecz accessed Defendant's Online Platforms at its direction and encouragement in relation to his past, present, and future health and healthcare needs.

118.    Plaintiff Brunecz reasonably expected that his online communications with WGH

were confidential, solely between himself and WGH, and that, as such, those communications would not be transmitted to or intercepted by a third party.

119.    Plaintiff Brunecz provided his Private Information to Defendant and trusted that the information would be safeguarded according to WGH's Privacy Policy and the law.

120.    On information and belief, through its use of the Meta Pixel and other tracking technologies, WGH disclosed to Facebook:

    a.  the pages and content Plaintiff Brunecz viewed;

    b.  Plaintiff's seeking of medical treatment;

    c.  Plaintiff's status as a patient;

    d.  information regarding Plaintiff Brunecz' patient portal activity;

    e.  the specialties of the medical providers Plaintiff Brunecz searched for and viewed;

    f.  the names of the medical providers Plaintiff Brunecz searched for and viewed;

    g.  the search results that Plaintiff Brunecz clicked on;

    h.  the medical services Plaintiff Brunecz viewed; and,

    i.  Plaintiff Brunecz' identity via his IP addresses and/or "c_user" cookie and/or Facebook ID.

121.    By failing to receive the requisite consent, WGH breached confidentiality and unlawfully disclosed Plaintiff Brunecz' Private Information.

122.    As a result of WGH's Disclosure of Plaintiff Brunecz' Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Plaintiff Brunecz has suffered the following injuries:

    a.  Loss of privacy; unauthorized disclosure of his Private Information; unauthorized access of his Private Information by third parties;

b.  Plaintiff Brunecz now receive targeted health-related advertisements on Facebook and other websites, reflecting his private medical treatment information;

c.  Plaintiff paid WGH for medical services and the services he paid for included reasonable privacy and data security protections for his Private Information, but Plaintiff did not receive the privacy and security protections for which he paid, due to Defendant's Disclosures;

d.  The portion of WGH's revenues and profits attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;

e.  The portion of WGH's savings in marketing costs attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;

f.  The portion of WGH's revenues and profits attributable to serving and monetizing advertisements directed to Plaintiff as a result of collecting Plaintiff's Private Information without authorization and sharing it with third parties;

g.  Value to Plaintiff Brunecz of surrendering his choice to keep his Private Information private and allowing WGH to track his data. The amount of these damages can be based on a baseline monthly compensation provided to participants in a Google consumer research study, the Ipsos Screenwise Panel where the baseline compensation to participants was $3 per device per month;

h.  Embarrassment, humiliation, frustration, and emotional distress;

i.  Decreased value of Plaintiff's Private Information;

j.  Lost benefit of the bargain;

k.  Increased risk of future harm resulting from future use and disclosure of his

Private Information; and

l.    Statutory damages.

123.    Plaintiff Brunecz discovered that Defendant was unauthorizedly disclosing his Private Information to Facebook via the Meta Pixel and other trackers on or around November 2023.

**C. Plaintiff Julie Ann Chapman's Experience**

124.    Plaintiff Julie Ann Chapman ("Plaintiff Chapman") has been a patient at WGH since 2021, and has received maternity care at WGH.

125.    Plaintiff Chapman relied on WGH's Website and Online Platforms to communicate confidential Private Information to Defendant, beginning in 2021, and last on or around January 2023, including: searches for treatments and medical information, topics related finding a doctor, scheduling appointments, and searching for treatment information.

126.    After Plaintiff Chapman used the Online Platforms, to find a doctor, to schedule appointments, to search for treatment information, to pay for medical services, and to use the Patient Portal, medical adds appeared on her Facebook feed. Specifically, advertisements for weight loss products.

127.    Plaintiff Chapman accessed Defendant's Online Platforms at its direction and encouragement in relation to her past, present, and future health and healthcare needs.

128.    Plaintiff Chapman reasonably expected that her online communications with WGH were confidential, solely between herself and WGH, and that, as such, those communications would not be transmitted to or intercepted by a third party.

129.    Plaintiff Chapman provided her Private Information to Defendant and trusted that the information would be safeguarded according to WGH's Privacy Policy and the law.

34

130. On information and belief, through its use of the Meta Pixel and other tracking technologies, WGH disclosed to Facebook:

    a. the pages and content Plaintiff Chapman viewed;

    b. Plaintiff's seeking of medical treatment;

    c. Plaintiff's status as a patient;

    d. information regarding Plaintiff Chapman's patient portal activity;

    e. the specialties of the medical providers Plaintiff Chapman searched for and viewed;

    f. the names of the medical providers Plaintiff Chapman searched for and viewed;

    g. the search results that Plaintiff Chapman clicked on;

    h. the medical services Plaintiff Chapman viewed; and,

    i. Plaintiff Chapman's identity via her IP addresses and/or "c_user" cookie and/or Facebook ID.

131. By failing to receive the requisite consent, WGH breached confidentiality and unlawfully disclosed Plaintiff Chapman's Private Information.

132. As a result of WGH's Disclosure of Plaintiff Chapman's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Plaintiff Chapman has suffered the following injuries:

    a. Loss of privacy; unauthorized disclosure of her Private Information; unauthorized access of his Private Information by third parties;

    b. Plaintiff Chapman now receive targeted health-related advertisements on Facebook and other websites, reflecting her private medical treatment information;

c.  Plaintiff paid WGH for medical services and the services she paid for included reasonable privacy and data security protections for her Private Information, but Plaintiff did not receive the privacy and security protections for which she paid, due to Defendant's Disclosures;

d.  The portion of WGH's revenues and profits attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;

e.  The portion of WGH's savings in marketing costs attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;

f.  The portion of WGH's revenues and profits attributable to serving and monetizing advertisements directed to Plaintiff Chapman as a result of collecting Plaintiff's Private Information without authorization and sharing it with third parties;

g.  Value to Plaintiff Chapman of surrendering his choice to keep her Private Information private and allowing WGH to track her data. The amount of these damages can be based on a baseline monthly compensation provided to participants in a Google consumer research study, the Ipsos Screenwise Panel where the baseline compensation to participants was $3 per device per month;

h.  Embarrassment, humiliation, frustration, and emotional distress;

i.  Decreased value of Plaintiff's Private Information;

j.  Lost benefit of the bargain;

k.  Increased risk of future harm resulting from future use and disclosure of his Private Information; and

l.  Statutory damages.

36

133.    Plaintiff Chapman discovered that Defendant was unauthorizedly disclosing his Private Information to Facebook via the Meta Pixel and other trackers on or around December 2023.

134.    Plaintiffs provided their Private Information to WGH and trusted that the information would be safeguarded according to WGH's privacy policies and the law.

**D.  Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI**

135.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[44] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

136.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway.  The report concluded that "[t]she information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[45]

137.    The New York State Department of Financial Service's concern about Facebook's

---

[44] Kurt Wagner & Bloomberg, *Facebook Admits Another Blunder with User Data*, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.
[45] *Report on Investigation of Facebook Inc. Data Privacy Concerns*, NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES, (Feb. 18, 2021) https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.

cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[46] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[47]

138.    More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[48]

139.    Furthermore, in June 2022, an investigation by The Markup[49] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[50] On those hospital

---

[46] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.) https://slate.com/technology/2022/06/health-data-brokers-privacy.html.

[47] *Id.*

[48] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document*, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

[49] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. *See* www.themarkup.org/about (last visited June 10, 2024).

[50] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[51] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[52]

140.    During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[53]

141.    In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[54]

142.    David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated she was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.[55]

**E.  WGH Violated HIPAA Standards**

143.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a

---

[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*

patient for marketing purposes without the patients' express written authorization.[56]

144.    If a HIPAA covered entity engages a business associate to help it carry out its health care activities and functions, the covered entity must have a written business associate agreement ("BAA") or other arrangement with the business associate that establishes specifically what the business associate has been engaged to do and requires the business associate to comply with the Rules' requirements to protect the privacy and security of protected health information. [57]

145.    Facebook will not sign a BAA and is therefore not HIPAA complaint.[58]

146.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

147.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[59]

148.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and

---

[56] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[57] *Covered Entities and Business Associates*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/covered-entities/index.html (last visited Aug. 12, 2024).
[58] Liyanda Tembani, Is Facebook HIPAA compliant? (Update 2024), PAUBOX, https://www.paubox.com/blog/facebook-hipaa-compliant (last visited Aug. 12, 2024).
[59] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of her or his protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[60]

149.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[61]

150.    According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[62]

151.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to

---

[60] *Marketing*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited June 10, 2024).
[61] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (March 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html
[62] *Id.*

others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [63]

152.    In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel is a violation of HIPAA Rules.

### F.    WGH Violated FTC Standards, and the FTC and HHS Take Action

153.    The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[64]

154.    On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[65]

155.    Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[66] and that "[t]her

---

[63] *Id.* (emphasis in original) (internal citations omitted).
[64] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (March 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html), **Exhibit A.**
[65] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.
[66] *Id.*

is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[67]

156.    Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id*. According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[68]

157.    Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[69]

158.    As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

---

[67] *Id.*

[68] *Statement of the Commission: On Breaches by Health Apps and Other Connected Devices*, U.S. FED. TRADE COMMISSION (Sept. 15, 2021), https://www.ftc.gov/legal-library/browse/statement-commission-breaches-health-apps-other-connected-devices (emphasis added).

[69] *See, e.g., U.S. v. Easy Healthcare Corp.*, Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *In the Matter of BetterHelp, Inc.*, FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *U.S. v. GoodRx Holdings, Inc.*, Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *In the Matter of Flo Health Inc.*, FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.

**G. WGH Violated Industry Standards**

159.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

160.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to WGH and its physicians.

161.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

162.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

163.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

**H. Plaintiffs' and Class Members' Expectation of Privacy**

164.    At all times when Plaintiffs and Class Members provided their Private Information to WGH, they all had a reasonable expectation that the information would remain private and that

44

WGH would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

## I.  IP Addresses are Personally Identifiable Information

165.    WGH also disclosed and otherwise assisted Facebook and Google and potentially others, with intercepting Plaintiffs' and Class Members' IP addresses using the Meta Pixel and other tracking technologies.

166.    An IP address is a number that identifies the address of a device connected to the Internet.

167.    IP addresses are used to identify and route communications on the Internet.

168.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

169.    Facebook tracks every IP address ever associated with a Facebook user.

170.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

171.    Under HIPAA, an IP address is Personally Identifiable Information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.  *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

172.    Consequently, by disclosing IP addresses, WGH's business practices violated HIPAA and industry privacy standards.

## J.  WGH Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures

173.    The sole purpose for WGH's use of the Meta Pixel and other tracking technology was marketing and profits.

174.    In exchange for disclosing the Private Information of its patients, WGH is compensated by Facebook and likely others in the form of enhanced advertising services and more cost-efficient marketing on its platform.

175.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, WGH re-targeted patients and potential patients.

176.    By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

**K.  Plaintiffs' and Class Members' Private Information Has Financial Value**

177.    The data concerning Plaintiffs and Class Members, collected and shared by WGH, has tremendous economic value. Data collected via the Meta Pixel, and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements. Targeting works by allowing advertisers to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[70] Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app, or engaging in certain online content.[71]

---

[70] *Audience Ad Targeting*, META, https://www.facebook.com/business/ads/ad-targeting (last visited June 10, 2024).
[71] *Id.*

Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."[72]

178.    Plaintiffs have a recognizable property interest in their browsing history. That browsing history has economic value, and by sharing, or facilitating the sharing of, such information with third parties such as Google and Facebook without prior approval, WGH took something of value from Plaintiffs and provided it to third parties without compensating Plaintiffs for the use of their Private Information and data, thus, causing the Plaintiffs economic injury.

179.    Plaintiffs' Private Information, which was taken by Defendant without permission, had value even though it was not "for sale." The browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. There is an entire data industry and estimates suggests that that industry generates billions of dollars.

180.

181.    Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.[73]

182.    This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per

---

[72] *See How to Create a Lookalike Audience on Meta Ads Manager*, META BUSINESS CENTER, https://www.facebook.com/business/help/465262276878947 (last visited June 10, 2024).
[73] *See* Rishi Iyengar, *Here's How Big Facebook's Ad Business Really Is*, CNN Business (July 1, 2020) https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html

American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

183.    In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, Time Magazine described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[74]

184.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[75]

## TOLLING, CONCEALMENT, AND ESTOPPEL

185.    The applicable statutes of limitation have been tolled as a result of WGH's knowing and active concealment and denial of the facts alleged herein.

186.    WGH seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing users with no indication that their Website usage was being tracked and transmitted to third parties. WGH knew that its Website incorporated the Meta Pixel and other trackers, yet it failed to disclose to Plaintiffs and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, and likely other third parties.

187.    Plaintiffs and Class Members could not with due diligence have discovered the full

---

[74] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.
[75] *See* Christina Farr, *Hospital Execs Say They are Getting Flooded with Requests for Your Health Data*, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

scope of WGH's conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel or any other tracking technology.

188.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. WGH's illegal interception and disclosure of Plaintiffs' Private Information has continued unabated through the present. What is more, WGH was under a duty to disclose the nature and significance of their data collection practices but did not do so. WGH is therefore estopped from relying on any statute of limitations defenses.

## CLASS ALLEGATIONS

189.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of other similarly situated persons.

190.    The Class that Plaintiffs seek to represent is defined as follows:

**All patients of WGH whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

191.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

192.    Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

193.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is

impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly accessed in the Disclosure, and each Class is apparently identifiable within Defendant's records.

194. <u>Ascertainability</u>. Class Members are readily identifiable from information in Defendant's possession, custody, and control.

195. <u>Commonality</u>: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

    a.  whether and to what extent Defendant had a duty to protect Plaintiffs' and Class Members' Private Information;

    b.  whether Defendant had duties not to disclose the Plaintiffs' and Class Members' Private Information to unauthorized third parties;

    c.  whether Defendant had duties not to use Plaintiffs' and Class Members' Private Information for non-healthcare purposes;

    d.  whether Defendant had duties not to use Plaintiffs' and Class Members' Private Information for unauthorized purposes;

    e.  whether Defendant failed to adequately safeguard Plaintiffs' and Class Members' Private Information;

    f.  whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

    g.  whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

    h.  whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential

communications and Private Information;

i.  whether Defendant breached its duties to Plaintiffs and the Class Members and was negligent;

j.  whether Defendant was negligent *per se*;

k.  whether Defendant invaded Plaintiffs' and the Class Members' privacy;

l.  whether an implied contract existed between Defendant and Plaintiffs and the Class Members;

m.  whether Defendant's Disclosure breached the implied contract;

n.  in the alternate, whether Defendant was unjustly enriched;

o.  whether Defendant owed fiduciary duties to Plaintiff and the Class Members;

p.  whether Defendant breached its fiduciary duties;

q.  whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

r.  whether Defendant breached the implied contract;

s.  whether Defendants were unjustly enriched;

t.  whether Defendant committed an invasion of privacy-intrusion upon seclusion;

u.  whether Defendant committed an invasion of privacy-public disclosure of private facts;

v.  whether Defendant violated the Pennsylvania Unfair Trade Practices And Consumer Protection Law, 73 Pa. Stat.§ 20101, et. seq. ("UTPCPL");

w.  whether Defendant violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701, et. seq. ("WESCA");

x.  whether Plaintiff and the Class Members are entitled to actual,

consequential, and/or nominal damages, and/or injunctive relief as a result

of Defendants' wrongful conduct.

196.    Typicality: Plaintiffs' claims are typical of those of other Class Members because

all had their Private Information compromised as a result of Defendant's use and incorporation of

Meta Pixel and other tracking technology.

197.    Policies Generally Applicable to the Class: This class action is also appropriate for

certification because Defendant has acted or refused to act on grounds generally applicable to the

Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards

of conduct toward the Class Members and making final injunctive relief appropriate with respect

to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members

uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect

to the Class as a whole, not on facts or law applicable only to Plaintiffs.

198.    Adequacy: Plaintiffs will fairly and adequately represent and protect the interests

of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be

antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or

adverse to the Class Members and the infringement of the rights and the damages Plaintiffs have

suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in

complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

199.    Superiority and Manageability: Class litigation is an appropriate method for fair

and efficient adjudication of the claims involved. Class action treatment is superior to all other

available methods for the fair and efficient adjudication of the controversy alleged herein; it will

permit a large number of Class Members to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and

expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

200.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

201.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

202.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

203.    Unless a Class-wide injunction is issued, Defendant may continue in its unlawful

use and disclosure and failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Member, and Defendant may continue to act unlawfully as set forth in this Complaint.

204.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

205.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a.    whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b.    whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.    whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

d.    whether an implied contract existed between Defendant on the one hand, and Plaintiffs

e.    and Class Members on the other, and the terms of that implied contract;

f.    whether Defendant breached the implied contract;

g.    whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information had been used and disclosed to third parties;

54

h.  whether Defendant failed to implement and maintain reasonable security procedures and practices;

i.  whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' Private Information; and

j.  whether Plaintiffs and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiffs and the Class)**

206.  Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

207.  Defendant owed to Plaintiffs and Class Members a duty to exercise reasonable care in handling and using Plaintiffs' and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

208.  Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiffs' and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

209.  Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiffs' and Class Members' Private Information.

55

210.    Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiffs and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

211.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiffs and Class Members. This failure actually and proximately caused Plaintiffs' and Class Members' injuries.

212.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

213.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence. These injuries are ongoing, imminent, immediate, and continuing.

214.    In failing to secure Plaintiffs' and Class Members' Private Information, PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights. Plaintiffs, in

addition to seeking actual damages, also seek punitive damages on behalf of themselves and the Class.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Class)

215.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

216.    Plaintiffs allege this negligence *per se* theory as alternative to their other negligence claim.

217.    Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' Private Information.

218.    Plaintiffs and Class Members are within the class of persons that these statutes and rules were designed to protect.

219.    Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' PII and PHI.

220.    Defendant owed a duty to timely and adequately inform Plaintiffs and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

221.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure

222.    ' and Class Members' PII and PHI in compliance with applicable laws would result in an unauthorized third-party such as Facebook gaining access to Plaintiffs' and Class Members' PII and PHI, resulting in Defendant's liability under principles of negligence *per se*.

223.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII and PHI and not complying with applicable industry standards as described in detail herein.

224.    Plaintiffs' and Class Member's PII and PHI constitute personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiffs and Class Members.

225.    As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiffs and Class Members to, *inter alia*, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

226.    In failing to secure Plaintiffs' and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights.

227.    Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' PII and PHI, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual, compensatory, and

punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

### COUNT III
### INVASION OF PRIVACY
**(On Behalf of Plaintiffs and the Class)**

228.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

229.    Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and Online Platforms and the communications platforms and services therein.

230.    Plaintiffs and Class Members communicated sensitive PHI and PII—Private Information—that they intended for only Defendant to receive and that they understood Defendant would keep private.

231.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion and their private affairs and concerns.

232.    Plaintiffs and Class Members had a reasonable expectation of privacy given Defendant's representations and Privacy Policies. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of PHI coupled with PII is highly offensive to the reasonable person.

233.    As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

234.    Plaintiffs and Class Members have been damaged as a direct and proximate result

of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

235.    Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

236.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

237.    Plaintiffs also seek such other relief as the Court may deem just and proper.

### COUNT IV
### BREACH OF IMPLIED CONTRACT
**(On behalf of Plaintiffs and the Class)**

238.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

239.    As a condition of receiving medical care from Defendant, Plaintiffs and the Class provided their Private Information and paid compensation for the treatment received. In so doing, Plaintiffs and Class Members entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its Privacy Policies and elsewhere, to keep such information secure and confidential.

240.    Implicit in the agreement between WGH and its patients, Plaintiffs and the proposed Class Members, was the obligation that both parties would maintain the Private Information confidentially and securely.

241.    WGH had an implied duty of good faith to ensure that the Private Information of Plaintiffs and Class Members in its possession was only used only as authorized, such as to provide

medical treatment, billing, and other medical benefits from WGH.

242.    WGH had an implied duty to protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses.

243.    Additionally, WGH implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

244.    Plaintiffs and Class Members fully performed their obligations under the implied contract with WGH. WGH did not. Plaintiffs and Class Members would not have provided their confidential Private Information to WGH in the absence of their implied contracts with WGH and would have instead retained the opportunity to control their Private Information for uses other than receiving medical treatment from WGH.

245.    WGH breached the implied contracts with Plaintiffs and Class members by disclosing Plaintiffs' and Class Members' Private Information to an unauthorized third party.

246.    WGH's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiffs and Class Members to provide their Private Information in exchange for medical treatment and benefits.

247.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and the Class have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

248.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

249.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

250.    This claim is pleaded solely in the alternative to Plaintiffs' breach of implied contract claim.

251.    Plaintiffs and Class Members conferred a monetary benefit upon WGH in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

252.    Plaintiffs and Class Members would not have used WGH's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Private Information to third parties.

253.    WGH appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

254.    As a result of WGH's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

255.    The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members themselves. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it

derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

256.    WGH should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the unauthorized Disclosure alleged herein.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Class)**

257.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

258.    A relationship existed between Plaintiffs and the Class, on the one hand, and Defendant, on the other, in which Plaintiffs and the Class put their trust in Defendant to protect the Private Information of Plaintiffs and the Class, and Defendant accepted that trust.

259.    Defendant breached the fiduciary duty that it owed to Plaintiffs and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, their Private Information.

260.    Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damage to Plaintiffs and the Class.

261.    But for Defendant's breach of fiduciary duty, the injury-in-fact and damage to Plaintiffs and the Class would not have occurred.

262.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to the Plaintiffs and the Class.

263.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs and Class Members are entitled to and do demand actual, consequential, and nominal damages,

injunctive relief, and all other relief allowed by law.

**COUNT VII**

**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION LAW, 73 PA. STAT.§ 20101 ET. SEQ.
("UTPCPL")**
**(On Behalf of Plaintiffs and the Class)**

264.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

265.    Plaintiffs, Class Members, and Defendant are all "persons" within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat.§ 201-2(2).

266.    The UTPCPL prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

267.    Under the UTPCPL, "[u]nfair or deceptive acts or practices" include: "[r]epresenting that ...  services have sponsorship, approval, characteristics, ...  [or] benefits ... that they do not have," 73 Pa. § 201-2(4)(v); "[r]epresenting that... services are of a particular standard ... [or] quality ... if they are of another," *id.*§ 201-2(4)(vii); "[a]dvertising... services with intent not to sell them as advertised," *id.* § 201-2(4)(ix); and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," *id.* § 201-2(4)(xxi).

268.    Defendant's acts, practices, and omissions alleged in this Complaint constitute unlawful, unfair, and deceptive acts and practices under the UTPCPL.

269.    Defendant knew or should have known about the unauthorized Disclosure of Plaintiffs' and the Class's Private Information via the Meta Pixel, yet WGH concealed that information from Plaintiffs and the Class.

270.    Defendant engaged in unlawful, unfair, and deceptive acts and practices prohibited by the UTPCPL by, among other things: misrepresenting or omitting material facts to Plaintiffs

and the Class regarding the adequacy of Defendant's protection of their Private Information, in violation of 73 Pa. Stat.§§ 201-(4)(v), (vii), (ix), and (xxi);

271.    Defendant's acts and omissions and its misrepresentations were intentional, knowing, and undertaken to mislead the public, including Plaintiffs and the members of the Class.

272.    Defendant's unlawful, unfair, and deceptive acts and practices were unethical, oppressive, and unscrupulous. These acts and practices caused substantial injury to Plaintiffs and members of the Class that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

273.    Defendant possessed exclusive knowledge about the Disclosure of Plaintiffs' and the Class Member's Private Information to unauthorized parties via the Meta Pixel to their detriment.

274.    Defendant had a duty to disclose the foregoing to Plaintiffs and Class Members and failed to do so.

275.    Plaintiffs and members of the Class reasonably relied on Defendant to protect and safeguard their Private Information and to promptly and adequately inform them of the unauthorized Disclosure.

276.    Defendant owed Plaintiffs and the Class duties to maintain the privacy and security of Plaintiffs' and the Class's Private Information; take proper action to prevent the Disclosure; take proper action following the Disclosure to protect further unauthorized disclosure, release, and theft of Private Information, and promptly inform Plaintiffs and members of the Class about the Disclosure.

277.    Plaintiffs and members of the Class suffered ascertainable losses of money or property as a result of Defendant's use and employment of methods, acts, or practices declared to be unlawful by 73 Pa. §§ 201-2(2) and 201-(3).

278.    Plaintiffs and the Class seek an order enjoining Defendant's unlawful acts and practices and awarding any other just and proper relief available under the UTPCPL including actual or statutory damages, treble damages, and attorneys' fees and costs.

**COUNT VIII**
**VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT 18 PA. C.S. § 5701, ET SEQ. ("WESCA")**
**(On Behalf of Plaintiffs and the Class)**

279.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

280.    The Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S.A. §§ 5701, 5703(1) ("WESCA") prohibits any person from willfully intercepting, endeavoring to intercept, or procuring of any other person to intercept or endeavor to intercept, any wire, electronic, or oral communication.

281.    WESCA defines "Person" as any employee, or agent of the United States or any state or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation. 18 Pa. C.S.A. § 5702.

282.    Defendant constitutes a "person" under WESCA, 18 Pa. C.S.A. § 5702.

283.    WESCA, 18 Pa. C.S.A. § 5702 defines "intercept," as "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. C.S.A. § 5702.

284.    WESCA, 18 Pa. C.S.A. § 5703(2)-(3) also prohibits the disclosure of, or use of, the contents of any wire, electronic, or oral communication, or any evidence derived therefrom, with

knowledge that the information was obtained through the interception of a wire, electronic, or oral communication.

285.    WESCA, 18 Pa. C.S.A. § 574l(a) further prohibits the knowing access without authorization of a facility through which an electronic communication is provided or exceeds an communication while that communication is in electronic storage.

286.    WESCA, 18 Pa. C.S.A. § 5741, is also violated where, for the purpose of commercial advantage or private commercial gain, a person knowingly accesses without authorization a facility through which an electronic communication service is provided, or exceed access to that facility, and obtains access to a wire or electronic communication while that communication is in electronic storage.

287.    As set forth herein, Defendant knowingly, willfully, and intentionally intercepted and disclosed Plaintiffs' and Class Members' electronic communications, without the consent of Plaintiffs and Class Members, using Facebook's and other third parties' tracking devices.

288.    Defendant knowingly, willfully, and intentionally intercepted Plaintiffs and Class Members' electronic communications for the purpose of disclosing those communications to third parties including Facebook and others without the knowledge, consent, or written authorization of Plaintiffs or Class Members.

289.    The devices used in this case, include, but are not limited to:

    a.    those to which Plaintiffs' and Class Members' communications were disclosed;

    b.    Plaintiffs' and Class Members' personal computing devices;

    c.    Plaintiffs' and Class Members' web browsers;

    d.    Plaintiffs' and Class Members' browser-managed files;

    e.    the Meta Pixel;

f.   internet cookies;

g.   other pixels, trackers, and/or tracking technology installed on Defendant's

h.   Website and/or server;

i.   Defendant's computer servers;

j.   third-party source code utilized by Defendant; and

k.   computer servers of third parties (including Facebook).

290.   Defendant aided in the interception of communications between Plaintiffs and Class Members and Defendant that were redirected to and recorded by third parties without the Plaintiffs' or Class Members' consent.

291.   WESCA confers a private civil cause of action to any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation thereof against "any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication." 18 Pa. C.S. § 5725(a).

292.   As a result of Defendant's violations of WESCA, pursuant to 18 Pa. C.S.A. § 5725(a), Plaintiffs and the Class Members are entitled to recover actual damages that are not less than liquidated damages computed at a rate of $100.00 a day for each day of violation or $1,000.00, whichever is higher; punitive damages; and reasonable attorneys' fees and other litigation costs reasonably incurred.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, JEFF BRUNECZ and JULIE ANN CHAPMAN, individually, and on behalf of all others similarly situated, prays for judgment as follows:

A.   for an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

68

B.  for an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law, including pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat.§ 20101, et seq. ("UTPCPL"), and the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S.A. §§ 5701, et seq. ("WESCA");

C.  for an award of punitive damages, as allowable by law;

D.  for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

E.  for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and unlawfully disclosed to third parties;

F.  for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

G.  an order Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

H.  for an award of attorneys' fees under UTPCPL, WESCA, the common fund doctrine, and any other applicable law;

I.  costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;

J.      pre- and post-judgment interest on any amounts awarded;

K.      Trial by jury on all issues so triable; and,

L.      such other and further relief as this court may deem just and proper.


Date: September 12, 2024            Respectfully submitted,

                                   By: */s/ Patrick Howard*_____
                                   SALTZ MONGELUZZI & BENDESKY P.C.
                                   Patrick Howard (PA Atty ID #88572)
                                   1650 Market Street, 52nd Floor
                                   Philadelphia, PA 19103
                                   (215) 496-8282
                                   phoward@smbb.com

                                   COHEN & MALAD LLP
                                   Lynn A. Toops (Pro Hac Vice forthcoming)
                                   One Indiana Square, Suite 1400
                                   Indianapolis, IN 46204
                                   (317) 636-6481
                                   ltoops@cohenandmalad.com

                                   STRANCH, JENNINGS & GARVEY, PLLC
                                   J. Gerard Stranch, IV (Pro Hac Vice forthcoming)
                                   Andrew E. Mize (Pro Hac Vice forthcoming)
                                   The Freedom Center
                                   223 Rosa L. Parks Avenue, Suite 200
                                   Nashville, TN 37203
                                   (615) 254-8801
                                   (615) 255-5419 (facsimile)
                                   gstranch@stranchlaw.com
                                   amize@stranchlaw.com

                                   STRAUSS BORRELLI PLLC
                                   Samuel J. Strauss (Pro Hac Vice forthcoming)
                                   Raina C. Borrelli (Pro Hac Vice forthcoming)
                                   980 N. Michigan Avenue, Suite 1610
                                   Chicago, IL 60611
                                   sam@straussborrelli.com
                                   raina@straussborrelli.com

                                   *Attorneys for Plaintiff and Proposed Class*