IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFF BRUNECZ and JULIE ANN CHAPMAN, individually and on behalf of all others similarly situated, | ) | Docket No. 1:24-cv-00203-SPB |
| Plaintiffs | ) | |
| v. | ) | |
| WARREN GENERAL HOSPITAL | ) | |
| Defendant | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

## INTRODUCTION

In this case about privacy rights, Plaintiffs have failed to meet their threshold burden of showing that any private or sensitive information was shared with third parties. Instead, Plaintiffs' long Amended Complaint paints the picture of normal use of a web-page—use that courts have held does not involve the sharing of private information.

Plaintiffs' Amended Complaint spends pages describing the technical workings of a piece of computer code called a "pixel." When installed in a website's source code, the pixel allegedly creates a computer operation that collects data whenever someone accesses that website. That data includes which webpages a user views, which buttons a user clicks, what words a user types in search bars, how far down the webpage a user scrolls, and similar data like the user's IP address—essentially, mere website usage data.

In describing one pixel's operation and another alleged so-called "tracker," the Amended Complaint conclusorily claims that Warren General Hospital ("WGH") collected and disclosed highly sensitive and confidential personal health data. But the pleaded facts—shorn of legal conclusions—do not fit that frame. There are no allegations that individual diagnoses were

collected, nor are there allegations about other individual medical information: no allegations of particular prescribed medication, no patients' charts, no specific symptoms, and no individual medical records. Instead, Plaintiffs merely allege that their website usage data was collected and disclosed.

Put simply, when alleged personal health information is just website usage data, the Amended Complaint fails to state sufficient facts to state a claim or a cognizable Article III injury. Here, the Amended Complaint does not allege a concrete injury, and Plaintiff's lack standing to seek an injunction because they have not (and cannot) plead a future injury. Importantly, Plaintiffs admit that "WGH does not ***presently*** install any trackers." Am. Compl. ¶ 78 (emphasis added). Furthermore, Plaintiffs' rely on regulations that a federal court vacated as unlawful this June for its violations of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d *et seq*. *See Am. Hosp. Ass'n v. Becerra*, No. 4:23-CV-01110-P, --- F.Supp.3d ----, 2024 WL 3075865, at *17 (N.D. Tex. June 20, 2024). Moreover, all causes of action fail due to insufficient facts pleaded. What's more, Plaintiffs wrongly interpret Pennsylvania's wiretap statute; the statute does not apply to surface-level website use, and the allegations do not state a claim. For these reasons, WGH respectfully requests that this Court dismiss all counts of the Amended Complaint with prejudice.

**RELEVANT ALLEGATIONS IN THE COMPLAINT[1]**

This is one of dozens of copycat lawsuits filed around the country, and this Amended Complaint appears to attempt to copy from them.[2] The core factual allegations boil down to an

[1] Consistent with FRCP 12(b)(6), WGH presents these facts accepting Plaintiff's factual allegations as true. *See US Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). Such acceptance is limited only to this motion.

[2] This Court may take judicial notice that these other lawsuits have been filed. *See* F.R.E. 201(b). *See* ECF No. 1, p.5, p.5 n.1 (Notice of Removal) (collecting cases).

assertion that WGH tracked and disclosed mere website usage data on unauthenticated webpages.

WGH summarizes here the Amended Complaint's allegations about how the Meta Pixel and Google Analytics works, how WGH allegedly installed and used them, and how the plaintiffs here were allegedly affected (including the only two named plaintiffs: Jeff Brunecz and Julie Ann Chapman). This summary excludes the seventy-page Amended Complaint's allegations describing other companies' conduct, generic allegations about consumer data, different states' laws, statements of law, other regulatory bodies' actions and notices, non sequiturs, and other rabbit holes.

Essentially, and as alleged, the Pixel collects website usage data. Plaintiffs allege that this collected data included "Personally Identifying Information" ("PII") and "Protected Health Information" ("PHI"). Am. Compl. ¶ 1. They collectively refer to these categories as "Private Information." *Id.* They define PII using the Federal Trade Commission's definition of "identifying information"—"any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.* 1 n.1. (quoting 17 C.F.R. § 248.201(b)(8)). They define PHI using HIPAA's definition of "protected health information"—"individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of

healthcare, payment for healthcare services, or use in healthcare operations."[3] *Id.* 1 n.1 (citing 45 C.F.R. § 160.103).

## I. THE META PIXEL AND GOOGLE ANALYTICS

A pixel captures website usage data. A pixel "is a snippet of code" creating a computer operation that tracks "events." *Id.* ¶ 9. "Events" are "user interactions with the site," including "pages viewed, buttons clicked, and information submitted." *Id.* In particular, the Meta Pixel can track the following information as alleged:

- "by default…information about a visitor's device, including their IP address, and the pages viewed";
- "[w]hen configured to do so . . . a visitor's search terms, button clicks, and form submissions,"
- "a webpage's [URL], as well as metadata, button clicks, and other information." *Id.*, ¶¶ 9-10, 45.

The Amended Complaint claims the following:

> 50. According to Facebook, the Meta Pixel can collect the following data.
>
> **Http Headers** - Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and person using the website.
>
> **Pixel-specific Data** - Includes Pixel ID and the Facebook Cookie.
>
> **Button Click Data** - Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.
>
> **Optional Values** - Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.
>
> **Form Field Names** - Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.

---

[3] Plaintiff's definition of PHI relies on the definition of "protected health information" in the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d *et seq*.

*Id.* ¶ 50. The Meta Pixel also collects "'c_user' cookie[s]." *Id.* ¶ 85. The Pixel's operation then "transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing." *Id.* ¶ 9. Indeed, "[t]he Meta Pixel's primary purpose is for marketing and ad targeting and sales generation." *Id.* ¶ 48.

Plaintiffs do not describe how Google Analytics works. Instead, they include only the vague assertion that "Google and other companies process data in a *similar manner*"—without stating how—"and use it to build marketing and other data profiles allowing for targeted advertising." *Id.* ¶ 105 (emphasis added).

## II. WGH'S ALLEGED USE OF THE META PIXEL AND GOOGLE ANALYTICS

WGH is an independent, nonprofit hospital in Warren, Pennsylvania. Am. Compl. ¶¶ 5, 31. WGH maintains a website at https://www.wgh.org/. *Id.* ¶ 6. WGH "encourages patients to use its Website" and its "Online Platforms"—"its various web-based tools and services," including its patient portal—MyPortal. *Id.* ¶¶ 7, 38-39. MyPortal allows patients to access their health information online, schedule appointments, and use other services offered by WGH. *Id.* ¶ 39. Plaintiffs claim that "WGH knowingly configured and implemented into its website…code-based tracking devices known as 'pixels' (also referred to as 'trackers' or 'tracking technologies')…." *Id.* ¶ 6.

Importantly, and as described in more detail below, there are no allegations that WGH shared any information from the MyPortal webpages. Instead, there are only allegations about tracking on pages that did not require authentication.

Additionally, "WGH *does not presently install any trackers* but WGH *previously installed* Google Analytics with Google Tag Manager and a Meta Pixel to disclose Plaintiffs' and Class Members' Private Information and confidential communications to third parties for marketing purposes, including Facebook and Google." *Id.* ¶ 78 (emphases added).

**Meta Pixel**. WGH allegedly installed a Meta Pixel "no later than January 2, 2024" and continued to do so until April 5, 2024. *Id.* ¶¶ 80-81. During that time, the Meta Pixel caused disclosure of information to Facebook. *Id.* ¶¶ 82-83. The Meta Pixel tracked and disclosed to Facebook certain website usage data, including that someone visited the Website, what webpages were viewed, what information the user typed in a search bar on the Website, what webpages the user was on when the user clicked a button, what search filters were used, the name of a doctor from search results that was clicked on, and other information that was clicked on. *Id.* ¶¶ 83–97.

As for patient medical records, the Meta Pixel sent Facebook "a PageView event revealing that the patient was on the 'medical-records' page." *Id.* ¶ 99. The Meta Pixel also allegedly tracked and disclosed if a user viewed WGH's contact page and if the user clicked to call the listed WGH phone number. *Id.* ¶ 100.

Plaintiffs' do *not* allege that the Meta Pixel tracked or disclosed *any patient medical records whatsoever*. There are no allegations that a copy of any page of any patients' medical record was tracked and disclosed. Likewise, there are no allegations that any particular patients' medical diagnosis, medical history, symptoms, condition, treatments, or medications were disclosed.

As for medical bills, when a user navigated to the page "PAY A BILL" on the Website, the Meta Pixel allegedly tracked and disclosed that to Facebook. *Id.* ¶ 101. The Amended Complaint does *not* allege that anyone's actual bills were tracked or disclosed, that anyone's payment information like credit cards or bank information were tracked or disclosed, or that anyone's treatments or medical information were tracked or disclosed this way.

The Meta Pixel also allegedly tracked who clicked to access WGH's patient portal—MyPortal. *Id.* ¶¶ 102–04. But the allegations about the patient portal stop there. From

paragraphs 79 through 103, the Amended Complaints provides detailed allegations about how information about search terms, results and button clicks are captured and transmitted. However, once the Amended Complaint gets to a patient accessing MyPortal—where individual information may be stored—the allegations stop. There is not a single allegation that the Meta Pixel records anyone's username or password, that it records any document contained within the patient portal, or that it even tracks any usage whatsoever within the patient portal. As described below, this failure is fatal to Plaintiff's claims.

**Google Analytics**. Even thinner are the allegations about Google Analytics. "WGH *previously* installed Google Analytics with Google Tag Manager." Am. Compl. ¶ 78 (emphasis added). WGH first installed a Google Analytics tracker "as early as November 23, 2016" and "connected its Google Analytics tracker with Google Tag Manager around May 2018." *Id.* ¶ 79. WGH installed these "until at least as recently as February 1, 2023." *Id.* ¶ 79. During that time, the Google Analytics tracker caused disclosure of information to Google. *Id.* ¶ 82.

Plaintiffs do not explain how the Google Analytics tracker works. While providing screengrabs from the WGH website for the operation of the Meta Pixel, Plaintiffs curiously do not provide the same about the Google Analytics tracker.[4]

---

[4] Despite including allegations about Meta's "Conversions Application Programming Interface ('CAPI')" (*Id.* ¶¶ 12-19, 22), Plaintiffs never allege that WGH installed CAPI. Instead, Plaintiffs hedge: WGH "willfully and intentionally incorporate[ed] tracking technology, including the Meta Pixel, *potentially CAPI*, and other tracking technology, into its Website"; "Facebook *encourages and recommends* use of [CAPI]," and "WGH employed the Meta Pixel and *potentially Conversions API*…" *Id.* ¶¶ 12, 22, 68 (emphases added). Plaintiffs also never allege that CAPI sent information to third parties for WGH: "The information that Defendant's Meta Pixel and *possibly CAPI* sent…" *Id.* ¶ 17.

Without allegations that WGH used CAPI, these are precisely the kinds of "conclusory or bare-bones allegations" that "will no longer survive a motion to dismiss." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Thus no further discussion of CAPI is needed.

After compiling this website usage data with the Pixel, Plaintiffs allege that WGH shared it "with Facebook and Google, and *possibly* other third parties" without Plaintiffs' knowledge. *Id.* ¶ 108 (emphasis added).[5] Facebook "compensate[s]" WGH for sharing WGH's website usage data. *Id.* ¶ 174. WGH uses the Meta Pixel "to further its marketing efforts," to "improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales," (alleged upon information and belief). *Id.* ¶¶ 25, 40.[6]

## III. PLAINTIFFS

The Complaint names two plaintiffs. Jeff Brunecz is a WGH patient, Julie Ann Chapman was a WGH patient, and allegedly both are residents and citizens of Pennsylvania. *Id.* ¶¶ 29-30. Crucially, neither named plaintiff alleges that their Website use caused collection or disclosure of any particular medical diagnosis, prescribed medication, patients' charts, specific symptoms, payment information like credit card or bank account numbers, or individual medical records.

---

[5] Although disclosure to more companies is alleged, no allegations describe how, why, or when WGH sent the website usage data to "Microsoft, DoubleClick, StackAdapt, Hotjar, Salesforce[,] CrazyEgg, and potentially others." *Id.* ¶ 1. These allegations about disclosure to companies other than Meta and Google are confined to a single paragraph. *Id.* Plaintiffs hedge again, writing that WGH sent website usage data "to Facebook and Google, and *possibly other third parties*." *Id.* ¶ 108 (emphasis added); *see also Id.* ¶ 113. And again, these are "conclusory or bare-bones allegations" that "will no longer survive a motion to dismiss." *Fowler*, 578 F.3d at 210.

[6] Plaintiffs' Original Complaint alleged, without detailing how they operate, that WGH also used other trackers: "MarketingCloudFX, Google Analytics with Google Tag Manager ('GTM'), Facebook Events, Microsoft Clarity, and DoubleClick." ECF No. 1-2 (Original Compl.) ¶ 84. In another run-on list, Plaintiffs claim that WGH used "other tracking technologies such as Google Analytics with Google Tag Manager ('GTM'), Microsoft Universal Events, DoubleClick, StackAdapt, Hotjar, Salesforce DMP, CrazyEgg, Salesforce Marking Cloud, and Salesforce Interaction Studio." *Id.* ¶ 94. Plaintiffs have since removed these allegations from the Amended Complaint, highlighting the copy-and-paste nature of their lawsuit. Because Plaintiffs provided no detail on how these programs work or how WGH used them, there were no facts supporting a claim about alleged use of these programs. These were "conclusory or bare-bones allegations" that "will no longer survive a motion to dismiss." *Fowler*, 578 F.3d at 210. Thus, no further discussion of these programs is needed.

Brunecz has used the Website and Online Platforms from 2012 to July 2023 for the following: "searches for treatments and medical information, topics related to finding a doctor for hernia treatment, scheduling appointments, searching for treatment information, and paying for treatment." *Id.* ¶ 115; *see also Id.* ¶ 120. He also "look[ed] for a doctor for a colonoscopy." *Id.* Since then, Brunecz's "Facebook feed was immediately bombarded with advertisements for 'Cologuard.'" *Id.* ¶ 116.

Chapman used the Website and Online Platforms from 2021 to January 2023 for the following: "searches for treatments and medical information, topics related finding a doctor, scheduling appointments, and searching for treatment information." *Id.* ¶ 125; *see also Id.* ¶ 130. Since then, "medical adds (sic) appeared on her Facebook feed. Specifically, advertisements for weight loss products." *Id.* ¶ 126.

Plaintiffs allege that WGH sent both Brunecz's and Chapman's website usage data "to Facebook and *possibly* others." *Id.* ¶ 107 (emphasis added). As a consequence of disclosure, both claim unspecified and unexplained injuries. *Id.* ¶ 113. Plaintiffs seek to represent a class defined as: "All patients of WGH whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization." *Id.* ¶ 190.[7]

**STANDARD OF REVIEW**

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court clarified the standard for determining whether a plaintiff has stated a claim upon which relief can be granted: A complaint must contain more than a simple "the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (*citing Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007)). "A motion to dismiss should be

[7] This proposed class definition is narrower than proposed in the Original Complaint, in which Plaintiffs sought to represent a class defined as "All persons whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization." Original Compl. ¶ 164.

granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (*quoting* *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010) (*quoting* *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### I. RECENT LEGAL DEVELOPMENTS ABOUT HIPAA'S REGULATIONS SHOW THAT PLAINTIFFS CANNOT SHOW A HIPAA VIOLATION FOR USE OF THIRD-PARTY TRACKING TOOLS ON UNAUTHENTICATED WEBPAGES—JUST AS ALLEGED HERE.

Plaintiffs Amended Complaint relies on regulations that a federal court vacated this June. In *American Hospital Association v. Becerra*, the court ruled that the government exceeded its authority when it issued a new rule published in a guidance bulletin in 2022 and its revision in 2024 (the "Vacated HIPAA Privacy Rule"). *Am. Hosp. Ass'n v. Becerra*, --- F.Supp.3d ----, 2024 WL 3075865, at *17 (N.D. Tex. June 20, 2024). That case concerned the confidentiality protections contained in the Vacated HIPAA Privacy Rule, more specifically, its "applicability to one subset of PHI: 'individually identifiable health information' ('IIHI'). HIPAA defines IIHI as information that (1) 'relates to' an individual's healthcare and (2) 'identifies the individual' or provides 'a reasonable basis to believe that the information can be used to identify the individual.'" *Id.* at *1. In December of 2022, the Department of Health and Human Services ("HHS") Office of Civil Rights issued a guidance document which prohibited its "Proscribed Combination"—"circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a ['unauthenticated public webpage'] addressing specific health conditions or healthcare providers." *Id.* at *2. Then, in 2024, HHS altered the "Original Guidance" when it issued the "Revised Bulletin." *Id.* The Revised Bulletin "softened language from the Original…and suggests the IIHI test is subjective. That is, the Revised Bulletin

insinuates that information can become IIHI if the individual's reason for visiting [an unauthenticated public webpages] relates to their personal healthcare (irrespective of the fact that such information is unknowable unless a[n] [unauthenticated public webpage] seeks it)." *Id.* With these regulatory revisions, this is the Vacated HIPAA Privacy Rule that the court addressed.

On review, the court held that HHS exceeded its statutory authority because the Vacated HIPAA Privacy Rule "violate[d] HIPAA's unambiguous definition of IIHI." *Id.* at *11. Significantly, the United States' government has decided not to appeal the case, with HHS withdrawing its appeal to the United States Court of Appeals for the Fifth Circuit on August 29, 2024.[8]

This development is critical to this case. Plaintiffs rely extensively on the Vacated HIPAA Privacy Rule in their Amended Complaint. For example, the HIPAA is mentioned and quoted in the very first substantive sentence of the Amended Complaint. Again in paragraphs 2, 4, 143, 144, 145, 146, 147, 148, 149, 150, 151, 151, 171, and 172, Plaintiff's specifically rely on the Vacated HIPAA Privacy Rule. These references are not oblique; they make the Vacated HIPAA Privacy Rule a critical part of Plaintiff's case. According to Plaintiffs, "HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel is a violation of HIPAA Rules." Am. Compl. ¶ 152. Each of these paragraphs are then incorporated, by reference into each of the Amended Complaint's six counts.

WGH drew the line on its website where the law required. After determination that the Vacated HIPAA Privacy Rule was not authorized under HIPAA, it is clear that third-party

---

[8] Nick Hut, *HHS concedes defeat in litigation over providers' use of tracking technologies on websites*, HEALTHCARE FINANCIAL MANAGEMENT ASSOCIATION (Sept. 6, 2024) (last accessed Sept. 25, 2024) (attached and incorporated herein as Defendant's Exhibit 1).

tracking technologies that collect merely website usage data are permitted on unauthenticated webpages. *See* *Am. Hosp. Ass'n*, 2024 WL 3075865, at *12-13 ("metadata from a [unauthenticated public webpage] search cannot constitute IIHI."). The trackers allegedly operate on the unauthenticated parts of the Website. There is no allegation that they ever operated on the authenticated parts—including MyPortal—that require personal login credentials. At most, the Meta Pixel and Google Analytics can get information on button clicks, webpage scrolling, search terms, and the like from the unauthenticated webpages; these trackers do not collect patients' private medical records, medication records, payment records, or other actual documents from authenticated pages including MyPortal. This is the precise distinction that the court in *American Hospital Association* found to be appropriate.

## II. PLAINTIFFS LACK ARTICLE III STANDING.

The named Plaintiffs lack Article III standing in two different ways. First, they have not alleged an injury that meets Article III's concreteness requirement. That prevents this Court from hearing any part of this case.[9] And second, even if the Plaintiffs have suffered a concrete injury, there is no reasonable likelihood of that injury recurring, so Plaintiffs lack standing to seek their requested injunction. Am. Compl. pp. 68-70 (Prayer for Relief).

### A. The Named Plaintiffs Have Not Alleged an Injury that is Sufficiently Concrete for Standing-Doctrine Purposes.

A plaintiff seeking redress in federal court must plead (1) an injury in fact, (2) fairly traceable to the defendant's challenged conduct, (3) that is likely to be redressed by a favorable judicial decision. *E.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). To establish an injury

[9] Dismissal for lack of Article III standing is generally without prejudice. *E.g.*, *Ellison v. Am. Bd. of Orthopedic Surgery*, 11 F.4th 200, 209 (3d Cir. 2021).

in fact, a plaintiff must show that she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.*

Concrete does not necessarily mean tangible; "[v]arious intangible harms can also be concrete," including "disclosure of private information." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). The Third Circuit has made clear, though, that alleging a "bare procedural violation," without more, is not enough to establish a sufficiently concrete injury for Article III standing. *Kamal v. J Crew Grp. Inc.*, 918 F.3d 102, 111 (3d Cir. 2019) (quoting *Spokeo*, 578 U.S. at 341). Instead, a plaintiff who asserts the violation of a statutory right must claim that she suffered a harm that has "long been seen as injurious." *Id.* (quoting *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 638 (3d Cir. 2017)). Only when a statutory right protects against such a harm will an alleged violation constitute an injury in fact "in and of itself." *Id.*

Although Plaintiffs' complaint is thick, Plaintiffs' particularized allegations are thin. The thrust of their allegations involve the collection and disclosure of metadata or website usage data on unauthenticated public webpages in the context of the online healthcare market. Clearly, this is not something that has "long been seen as injurious." *See Farst v. AutoZone, Inc.*, 700 F. Supp. 3d 222, 229 (M.D. Pa. 2023) (citing *Kamal*, 918 F.3d at 111). WGH's mere use of the Meta Pixel or Google Analytics on its Website, without more, is therefore insufficient to establish a concrete harm. *See* *Id.* Instead, to establish standing, Plaintiffs must also demonstrate that their alleged harm closely mirrors an injury that American courts have traditionally recognized as the basis for a lawsuit. *Id.*

Doubtless, Plaintiffs will argue that the common-law tort of invasion of privacy—which their complaint purports to plead—fits this bill. Other courts within the Third Circuit, however,

have made clear that merely pleading an electronic invasion of privacy based on mere website usage data is not enough to confer standing. *See, e.g.*, *In re BPS Direct, LLC*, MDL 3074, 2023 WL 8458245, at *6 (E.D. Pa. Dec. 5, 2023). Instead, courts reviewing allegations of surreptitious website tracking typically hold that standing only exists when "*highly sensitive* personal information such as medical diagnosis information or financial data" is disclosed in the process. *Id.* (emphasis added).

But the named Plaintiffs do not allege that the tracking software uncovered any concrete diagnoses. Plaintiffs do not claim, for example, that WGH disclosed the contents of a confidential doctor's note or test result that was stored on MyPortal. Instead, they merely claim that WGH disclosed their search history, website analytics, IP address, and other data. *See* Am. Compl. ¶¶ 79-80, 101-08. Further, as the court held in *American Hospital Association v. Becerra*, this alleged tracking of mere website usage is not protected under the very regulations relied upon by the Plaintiffs. 2024 WL 3075865, at *17. The conduct Plaintiffs' allege is not the kind of "highly sensitive personal information" that Article III requires in this context. Accordingly, Plaintiffs' Amended Complaint should be dismissed.

### B. In Addition, Plaintiffs Lack Standing to Seek Injunctive Relief Because There Is No Reasonable Likelihood of Them Suffering a Future Injury as a Result of Warren General Hospital's Conduct.

The Plaintiffs also lack Article III standing to seek injunctive relief. For that reason, this Court should dismiss their request for injunctive relief under Federal Rule of Civil Procedure 12(b)(1).

Before a plaintiff can ask a federal court for an injunction, she must demonstrate that she is "likely to suffer future injury from the defendant's conduct." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig.*, 903 F.3d 278, 292 (3d Cir. 2018) ("*In re Johnson & Johnson*") (internal quotation marks omitted). Conjectural or speculative

injuries are not enough to satisfy Article III. *McNair v. Synapse Grp., Inc.*, 672 F.3d 213, 225 (3d Cir. 2012). In putative class actions, at least one named plaintiff must satisfy this future-injury requirement. *Silva v. Rite Aid Corp.*, 416 F. Supp. 3d 394, 400 (M.D. Pa. 2019) (citing *McNair*, 672 F.3d at 223).

Plaintiffs' amended complaint, however, is devoid of any plausible allegation of future injury. For one thing, Plaintiffs admit that "WGH does not *presently* install any trackers…" Am. Compl. ¶ 78. For another, they are not likely to use the Website again. That follows because Plaintiffs essentially argue that WGH disclosed their private medical information (really, mere website usage data) without their knowledge or consent. But the Plaintiffs are now well aware of the alleged privacy risks that purportedly accompany Warren General Hospital's web-based services—their lengthy complaint makes that abundantly clear. Any allegation of future injury, therefore, is speculative at best and implausible at worst.

Consider *McNair v. Synapse Group.* In that case, the Third Circuit addressed whether customers of a magazine company had standing to seek injunctive relief. *McNair*, 672 F.3d at 215. The defendant in that case had allegedly sold subscriptions in an unlawfully deceptive way. *See Id.* at 216. But, because the plaintiffs were customers who were already aware of Synapse Group's allegedly unlawful practices, the Third Circuit concluded that the possibility of suffering a future injury was "wholly conjectural." *Id.* at 225. According to the court, "[i]f Appellants' suggestion is that they may not be able to help themselves when confronted with a really good [product or service], they have still not provided a basis for standing. Pleading a lack of self-restraint may elicit sympathy but it will not typically invoke the jurisdiction of a federal court." *Id.* at 225 n.13.

Consider, also, *In re Johnson & Johnson*. There, the Third Circuit confronted another injunction request—this time, a request to enjoin Johnson & Johnson from selling baby powder that failed to warn of certain health risks. *In re Johnson & Johnson*, 903 F.3d at 292. Again, the court was not receptive. The court said this:

> [The plaintiff] has sued Johnson & Johnson for failing to warn her of certain health risks. To state the obvious, then, she is presently aware of those risks. As with the former customers in *McNair*, we wonder how [the plaintiff] could possibly be deceived again into buying Baby Powder without being aware of those same risks. . . . [W]e will not give cognizance to this sort of "stop me before I buy again" claim.

*Id.* at 292-93.

Similarly, in *Silva v. Rite Aid Corporation*, several plaintiffs claimed that Rite Aid had deceptively labeled certain nutritional supplements. *Silva*, 416 F. Supp. 3d at 398. They sued, requesting an injunction prohibiting Rite Aid from continuing this practice. *Id.* at 399-400. But the court refused, ruling that they lacked standing to seek injunctive relief. *Id.* at 400. According to the court, "[t]o suffer the same injury from a future purchase, plaintiffs would have to ignore their knowledge and experience regarding Rite Aid's labeling practices." *Id.* (citing *McNair*, 672 F.3d at 225 n.15). Put differently, the plaintiffs were asking the court "to presume [that] they will be fooled again and again." *Id.* The court declined to do so, stating that the law "presumes that individuals act rationally in light of the information they possess." *Id.* (citing *McNair*, 672 F.3d at 225). "When an individual suffers an injury and subsequently becomes aware of the cause of that injury, the law affords that individual the dignity of assuming that they will not act in a manner which results again in the same injury." *Id.*

But perhaps no case dooms Plaintiffs' request for injunctive relief as squarely as *In re BPS Direct, LLC*. That case is virtually identical to this one. In *BPS Direct,* certain website users challenged two retailers' undisclosed tracking of consumers' keystrokes, text entries,

clicks, scrolls, zooms, window resizes, mouse movements, and other personal information. *In re BPS Direct, LLC*, MDL 3074, 2023 WL 8458245, at *2 (E.D. Pa. Dec. 5, 2023). Just like this case, the website users asked the court to enjoin the retailers from "continuing the unlawful practices described" in their complaint. *Id.* at *20. But the court refused. Applying *McNair* and *In re Johnson & Johnson*, the court reasoned that the website users "may visit [the websites] again, but they will do so with the knowledge" that the embedded computer code "is capturing their movements." *Id.* Put simply, they "will not be deceived again in the future." *Id.*

Plaintiffs are now well aware of the alleged risks involved in using WGH's web-based products and services. *McNair* and its progeny stand for the proposition that, once that occurs, future injury becomes speculative and implausible, and thus cannot support an injunction.[10]

## III. COUNT I: NEGLIGENCE

Plaintiffs fail to state a claim for negligence under Pennsylvania Law. Am. Compl. ¶¶ 206-214. To plead a claim for negligence, a plaintiff must set forth "a duty to conform to a certain standard for the protection of others against unreasonable risks; the defendant's failure to conform to that standard; a causal connection between the conduct and the resulting injury; and actual loss or damage to the plaintiff." *Jones v. Plumer*, 226 A.3d 1037, 1039–40 (Pa. Super. Ct. 2020) (citing *Brewington for Brewington v. City of Philadelphia*, 199 A.3d 348, 355 (Pa. 2018)). Here, Plaintiffs cannot establish a duty that Defendant breached, either at common law or from statute, nor can they demonstrate causation or damages.

[10] To be sure, the Amended Complaint does allege that Plaintiffs face an "increased risk of harm resulting from further unauthorized use and disclosure of their [p]rivate [i]nformation." Am. Compl. ¶¶ 122(k), 132(k). But that bald legal conclusion, absent any supporting factual allegations, is similarly insufficient to satisfy Article III's requirements.

**A. No Common Law Duty**

In Pennsylvania, while "[c]ertain entities that collect data have a duty to protect that information," that duty does not extend to all data. *Santoro v. Tower Health*, 2024 WL 1773371, at *5 (E.D. Pa. Apr. 24, 2024). The duty exists only when the data "involved specific sensitive information, including 'names, birth dates, social security numbers, addresses, tax forms, and bank account information.'" *Id.* (quoting *Dittman v. UPMC*, 196 A.3d 1036, 1047-48 (Pa. 2018) (in a data breach case, imposing a duty on an employer collecting employees' "personal and financial information" to "exercise reasonable care in collecting and storing" the information)).

Here, the website usage data involved is not of the nature that courts have found gives rise to a duty to protect information. Plaintiffs assert that WGH owed them "a duty to exercise reasonable care in handling and using [Plaintiffs] Private Information in its care and custody." Am. Compl. ¶ 207. The website usage data like IP addresses, internet cookies, and webpage views, however, are not specific and sensitive information covered by any common law duty. *See* *Santoro*, 2024 WL 1773371, at *5 (dismissing negligence claim based on alleged operation of the Meta Pixel).

**B. No Causation**

Plaintiffs additionally have not plausibly pleaded causation. They generally allege that they visited the Website and conducted certain searches, and then at some later date began receiving ads for categories of health treatment. But they cannot allege that those ads were related to Plaintiff's activity on the WGH website. Those vague allegations and omissions about the Meta Pixel fail to show causation. *See* *Santoro*, 2024 WL 1773371, at *6.

Where plaintiffs "do not make any specific averments to substantiate their allegations… offer no details about the identity of any intended recipient or the content, timing, or number of the alleged communications," courts find the allegations "no more than 'naked assertion[s]

devoid of further factual enhancement.'" *Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, 2023 WL 7017734, at *5 (E.D. Pa. Oct. 10, 2023) (citing *Iqbal*, 556 U.S. at 678-79).

**C. No Damages**

Plaintiffs have not articulated any damages with the requisite specificity. Plaintiffs allege that WGH's negligence

> actually and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence. These injuries are ongoing, imminent, immediate, and continuing.

Am. Compl. ¶ 213. Under *Iqbal*, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." 556 U.S. at 678. Federal district courts in Pennsylvania have routinely treated allegations that plaintiffs "'suffered damages,' including 'embarrassment, humiliation, emotional harm, and distress'" as merely "boilerplate" and without "facts to support them." *Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, 2023 WL 7017734, at *5 (E.D. Pa. Oct. 10, 2023). Without description of "how [plaintiffs] sustained these alleged 'damages'" or allegations to "otherwise substantiate their existence," plaintiffs' the claim fails to allege actual loss to support a negligence claim. *Id.*; *see also* *Lapensohn v. Hudson City Sav. Bank*, 2021 WL 1581402 (E.D. Pa. Apr. 21, 2021) (granting a defendant's motion to dismiss where plaintiffs alleged in conclusory fashion that they "suffered substantial damages").

Here, Plaintiffs' alleged damages are similarly conclusory.

## IV. COUNT II: NEGLIGENCE PER SE

Plaintiffs claim for negligence per se must be dismissed. Plaintiffs allege violations of HIPAA, the HIPAA Privacy Rule, and the FTC Act to support negligence per se. Am. Compl.

¶¶ 152, 158, 215-227. Plaintiffs' legal theory for the HIPAA violations relies expressly on the Vacated HIPAA Privacy Rules (*Id.* ¶¶ 149-152), which a federal court vacated as unlawful this June. *See* *Am. Hosp. Ass'n v. Becerra*, --- F.Supp.3d ----, 2024 WL 3075865, at *17 (N.D. Tex. June 20, 2024).

Under Pennsylvania law, negligence per se "establishes the elements of duty and breach of duty where an individual violates an applicable statute, ordinance, or regulation designed to prevent a public harm." *Schemberg v. Smicherko*, 85 A.3d 1071, 1074 (Pa. Super. Ct. 2014). To set forth a negligence per se claim, plaintiffs must set forth: "(1) The purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally; (2) The statute or regulation must clearly apply to the conduct of the defendant; (3) The defendant must violate the statute or regulation; (4) The violation of the statute or regulation must be the proximate cause of the plaintiff's injuries." *In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F.Supp.3d 514, 531 (M.D. Pa. 2021) (citing *Schemberg*, 85 A.3d at 1074 (quoting *Mahan v. Am–Gard, Inc.*, 841 A.2d 1052, 1058–59 (Pa. Super. Ct. 2003)).

Plaintiffs' negligence per se claim must be dismissed for three reasons.

First, negligence per se would only establish the duty and breach. As explained above, Plaintiffs' fail to plead the other elements of negligence. That is because "[n]egligence per se… is not 'an independent basis of tort liability but rather establishes, by reference to a statutory scheme, the standard of care appropriate to the underlying tort.'… Where a plaintiff alleges negligence and negligence per se as separate causes of action, courts within the Third Circuit routinely dismiss the negligence per se claim as subsumed within the standard negligence claim." *Id.* (internal citations omitted). Therefore, because Plaintiffs have alleged negligence and

negligence per se at separate causes of action, Plaintiffs' negligence per se claim is "subsumed" by their failing negligence claim, and so must be dismissed.

Second, "[t]he negligence per se claim is untenable because neither the FTC Act nor the HIPAA regulations are public safety laws." *Weddle v. WakeMed Health and Hospitals*, 2023 WL 8369786, at *2 (N.C. Super. Ct. Dec. 4, 2023). "A safety statute or ordinance is one designed for the protection of life or limb and which imposes a duty upon members of society to uphold that protection." *Id.* (citation omitted). In *Weddle*, when plaintiffs sued a hospital for using the Meta Pixel, the court held that neither the FTC Act nor HIPAA could support negligence per se because "[t]hese are primarily competition and privacy laws, not laws for the protection of life or limb." *Id.* Similarly here, HIPAA, its regulations, and the FTC Act cannot support negligence per se. *See, e.g.*, *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1087 (N.D. Cal. 2023) ("the negligence per se claim based on a duty created by HIPAA is dismissed"); *Teeter v. Easterseals-Goodwill N. Rocky Mountain, Inc.*, 2023 WL 2330241, at *4 (D. Mont. Mar. 2, 2023) (dismissing negligence per se cause of action based on HIPAA); *In re: Netgain Tech., LLC*, 2022 WL 1810606, at *16 (D. Minn. June 2, 2022) ("Here, Plaintiffs have not cited any precedent in California, Minnesota, Nevada, South Carolina, or Wisconsin that permits a state-law negligence per se claim to proceed based on the theory that there is a violation of Section 5 of the FTC Act.").

Third, Plaintiffs' allegations do not properly allege violations of the FTC Act or HIPAA.[11] Although Plaintiff alleges that disclosures violated "the FTC Act, HIPAA, the HIPAA

[11] Plaintiffs cannot sue directly under HIPAA because the statute does not provide a private right of action. *See* *Johnson v. WPIC*, 782 F. App'x 169, 171 (3d Cir. 2019) (per curiam). Nor does the FTC Act. *See* *Roma v. Prospect Med. Holdings, Inc.*, 2024 WL 3678984, at *10 (E.D. Pa. Aug. 6, 2024) (citing *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir. 1990)).

Privacy Rule[s]…45 C.F.R. Part 160 and 164, Subparts A and C" (Am. Compl. ¶ 217), Plaintiffs' factual allegations (shorn of legal conclusions and conclusory statements) do not fall within the scope of these statutes.

*First, HIPAA*.[12] The website usage data allegedly disclosed does not qualify as HIPAA protected individual identifiable information. *See Am. Hosp. Ass'n v. Becerra*, --- F.Supp.3d ----, 2024 WL 3075865, at *17 (N.D. Tex. June 20, 2024). For instance, in a case about a hospital's use of the Meta Pixel, the court dismissed a claim that relied on violations of HIPAA because the plaintiff did not allege disclosure of "particular health or treatment information" but only alleged disclosure of "meta data" like "IP addresses, Facebook IDs, cookie identifiers, device identifiers and account numbers [and] URLs, buttons, pages, and tabs they click and view." *Hartley v. Univ. of Chicago Med. Ctr.*, 2023 WL 7386060, at *2 (N.D. Ill. Nov. 8, 2023). Discussing whether similar search information was subject to HIPAA disclosure requirements, the Ninth Circuit stated "[i]nformation available on publicly accessible websites stands in stark contrast to the personally identifiable patient records and medical histories protected by these statutes— information that unequivocally provides a window into an individual's personal medical history." *Smith v. Facebook, Inc.*, 745 Fed. Appx. 8, 9 (9th Cir. 2018) (citations omitted)). "Put simply, *the connection between a person's browsing history and his or her own state of health is too tenuous to support Plaintiffs' contention that the disclosure requirements of HIPAA*." *Id.* (emphasis added)

As another example, in *Murphy v. Thomas Jefferson University Hospitals*, the court found allegations concerning communications pertaining to "medical symptoms, conditions, and concerns, medical appointments, medical tests and test results, doctors' visit notes, medications

[12] WGH does not dispute that, for HIPAA purposes, it is a "covered entity."

and treatments, and health insurance and medical bills" as "vague allegations amount[ing] to 'no more than conclusions, [and] are not entitled to the assumption of truth.'" 2023 WL 7017734, at *3 (E.D. Pa. Oct. 10, 2023) (citing *Santiago v. Warminster Twp*., 629 F.3d 121, 131 (3d Cir. 2010)). There, because Plaintiffs did "not allege, for example, that any specific test results, diagnoses, or sensitive messages were intercepted or improperly disclosed," the allegations of disclosure of confidential information were not specific enough to state a claim for alleged misconduct. *Id.* at *3. The court similarly rejected as conclusory plaintiffs' allegations "that they communicated directly with doctors and medical staff" when they did "not make any specific averments to substantiate that assertion" nor did they "offer facts with respect to those individuals' identities or the timing or number of those communications." *Id.* Therefore, the court said, "even if Plaintiffs had submitted a more detailed description of the 'wide range of personal, private healthcare information' at the heart of [the] case, the Court would not consider these allegations 'well-pleaded,' and it therefore need not accept them as true." *Id.* *See also* *Santoro v. Tower Health*, 2024 WL 1773371, at *4 (E.D. Pa. Apr. 24, 2024) (in a complaint about a healthy system's use of the Meta Pixel, dismissing negligence claim because the following "conclusory or bare-bones allegations' did not state a violation of HIPAA: "[s]ince 2018, Mr. Santoro has used Tower Health's website to engage in communications that included individually-identifiable health information about his past, present, or future health conditions, including requests for information about specific Tower Health Providers and locations, and information about specific health conditions, treatments, and medications.").

Further, Plaintiffs mistakenly allege that IP addresses are "Personally Identifiable Information" protected from disclosure by HIPAA. Am. Compl. ¶ 171. Indeed, one court has held that disclosure of IP addresses did not violated HIPAA. *See* *Hartley*, 2023 WL 7386060, at

*2. Furthermore, before the vacatur of its regulation this year, HHS took the position in its Vacated HIPAA Privacy Rule that it was unlawful under HIPAA when "an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers…if the visit to the webpage is ... related to the individual's own health." *Am. Hosp. Ass'n*, 2024 WL 3075865, at *5. The court vacated this regulation because mere connection of an individual to an IP address that visits a hospital's website does not violate HIPAA. *Id.* at *12. And, as noted above, the United States' government has decided not to appeal this ruling. *See* Def. Ex. 1.

HIPAA does not define "Personally Identifiable Information" as alleged by Plaintiffs. Am. Compl. ¶ 171. HIPAA only addresses "Protected Health Information." Nowhere in the definition of protected health information is there a reference to IP addresses. 45 C.F.R. § 160.103 (Definitions). The only place where HIPAA discusses IP addresses is in a regulation discussing the process whereby an entity seeks to "de-identif[y] protected health information" and provides "[t]he following identifiers of the individual . . . , are removed…IP addresses." 45 C.F.R. § 164.514 (b)(2)(ii)(O), (R). Thus, HIPAA neither defines PII nor does it state that IP addresses are protected health information. HIPAA simply states that if an entity is going to disclose PHI, then to de-identify it, that entity must remove information including IP addresses. This requirement is irrelevant to Plaintiffs' claims because it does not convert ones' IP address into the sort of highly sensitive information that Plaintiffs must allege to support their claim.

*Second, the FTC Act*. To state a claim for violation of section 5 of the FTC Act, there must be "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." *Vino 100, LLC v. Smoke on the Water, LLC*, 864 F. Supp. 2d 269, 279 (E.D. Pa. 2012). Regarding Plaintiffs' claim of an FTC Act violation, as

Plaintiff identified, "[t]he Federal Trade Commission defines 'identifying information' as 'any name or number that may be used, alone or in conjunction with any other information, to identify a specific person,' including, among other things, '[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number.'" Am. Compl. ¶ 1, n.1 (citing 17 C.F.R. § 248.201(b)(8)).

But as discussed above, the collection of mere website usage data does not fall within either the HIPAA for FTC definitions of protectable information. And Plaintiffs have not alleged—beyond legal conclusions—that these alleged collections and disclosures of website usage data were "unfair" or "deceptive" within the meaning of the FTC Act. *See Vino 100, LLC*, 864 F. Supp. 2d at 279.

Thus, any of the three arguments given above require dismissing Plaintiffs' negligence per se claim.

## V. Count III: Invasion of Privacy

Plaintiffs also fail to state a claim for invasion of privacy. Am. Compl. ¶¶ 228-237. "Under Pennsylvania law, invasion of privacy involves four separate torts: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness for commercial purposes; (3) publicity given to another's private life; and 4) publicity that unreasonably places another in a false light before the public." *Gabriel v. Giant Eagle, Inc.*, 124 F.Supp.3d 550, 571 (W.D. Pa. 2015) (citing *Doe v. Wyoming Valley Health Care Sys., Inc.*, 987 A.2d 758, 765 (Pa. Super. Ct. 2009)). To set forth a claim for intrusion upon seclusion, Plaintiffs must demonstrate "(i) an intentional intrusion (ii) upon the seclusion of another that is (iii) highly offensive to a reasonable person." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 293 (3d Cir. 2016). In order to survive dismissal, a plaintiff must "aver sufficient facts to establish

that the information disclosed would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities…[C]ourts may decide the highly offensive issue as matter of law at the pleading stage when appropriate." *Santoro v. Tower Health*, CV 22-4580, 2024 WL 1773371, at *6 (E.D. Pa. Apr. 24, 2024) (internal citations omitted)

But mere website usage data does not measure up to this tort. Here, Plaintiffs allege that WGH disclosures amounted to "an intentional intrusion on [Plaintiffs'] solitude or seclusion and their private affairs and concerns." Am. Compl. ¶¶ 230-31. They allege that this disclosure of their "Private Information" violated their reasonable expectation of privacy—a bald legal conclusion. *Id.* ¶¶ 118, 128. Chapman's factual allegations are limited to using the Website for "searches for treatments and medical information, topics related finding a doctor, scheduling appointments, and searching for treatment information." *Id.* ¶ 125; *see also Id.* ¶ 130. Brunecz's alleged the same, adding only that he searched for a doctor for "hernia treatment" and "a doctor for a colonoscopy." *Id.* ¶ 115; *see also Id.* ¶ 120. Crucially, neither named plaintiff alleges that their Website use caused collection or disclosure of any *particular* medical diagnosis, prescribed medication, patient's charts, specific symptoms, payment records, personal financial information, or individual medical records.

No court has found that disclosure of the type of information Plaintiffs allege was disclosed—search history, search terms, browsing history—was "highly offensive" to satisfy a claim for intrusion upon seclusion. Instead, courts have held that collection and disclosure of simple website usage data does not amount to an invasion of privacy.

In a case over use of the Meta Pixel, the court held that "the characterization" of website usage data as "individually-identifiable health information" is just that—a characterization, not a factual allegation sufficient to support a claim. *See Santoro*, 2024 WL 1773371, at *6

("Plaintiffs alleged that their browsing activity was tracked, but there are no factually supported allegations suggesting that this intrusion was 'highly offensive' or what information, if any, may have been disclosed in violation of a privacy policy"). In another case about use of the Meta Pixel, when the allegations "show[ed] only that Plaintiffs searched and viewed publicly available health information that cannot, in and of itself, reveal details of an individual's health status or medical history," the court held that this did not constitute "'qualitatively different' and 'sensitive'…health-related data." *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018).

For these reasons, the invasion of privacy claim must be dismissed.

## VI. COUNT IV: BREACH OF IMPLIED CONTRACT

In order to set forth a claim for breach of an implied contract, Plaintiffs must plausibly allege the creation of an implied contract and the breach of such implied contract by Defendants. "In Pennsylvania, a claim for breach of contract requires (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). "The essential elements of breach of implied contract are the same as an express contract, except the contract is implied through the parties' conduct, rather than expressly written." *Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 675 (E.D. Pa. 2015), *aff'd sub nom. Enslin v. Coca-Cola Co.*, 739 F. App'x 91 (3d Cir. 2018) (citing *Highland Sewer & Water Auth. v. Forest Hills Mun. Auth.*, 797 A.2d 385, 390 (Pa. Commw. Ct. 2002)). Intent can be "gleaned from the parties' ordinary course of dealing," but "naked assertions devoid of further factual enhancement fail to state an actionable claim." *Longenecker-Wells v. Benecard Services Inc.*, 658 F. App'x. 659, 662 (3d Cir. 2016).

Plaintiff's claim fails at multiple points. First, there is no course of conduct alleged here. There are no allegations whatsoever of conversations, discussions, or transactions about the

alleged privacy expectations at issue. *See generally* Am. Compl. ¶¶ 238-248. Second, the allegations do not show a meeting of the minds. *See Id.* For one thing, Plaintiffs have not alleged that WGH promised to keep the website usage data private. For another, Plaintiffs have not alleged that they knew that they were providing website usage data to WGH, so how could there have been a meeting of the minds to protect such data?

Third, there are also no allegations about the "essential terms" of the contract. *See* *CoreStates Bank*, 723 A.2d at 1058. For instance, the Amended Complaint blithely alleges that "Plaintiffs and Class Members fully performed their obligations under the implied contract with WGH" (Am. Compl. ¶ 219), but do not state what their obligations were. This leaves only the allegation that "WGH had an implied good faith duty to protect the Private Information" [read: website usage data]. Am. Compl. ¶ 242. With only that legal conclusion left, a lone allegation that "an implied contract arose 'from the course of conduct'" between plaintiffs and the defendant was "insufficient to defeat a motion to dismiss." *In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F. Supp. 3d 514, 534–35 (M.D. Pa. 2021) (quoting *Longenecker-Wells v. Benecard Servs. Inc*, 658 F. App'x 659, 660 (3d Cir. 2016)). Plaintiffs' claim for breach of implied contract must be dismissed.[13]

## VII. COUNT V: UNJUST ENRICHMENT

To state a claim for unjust enrichment under Pennsylvania law, a plaintiff must allege "(1) that the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under circumstances in which it

[13] Plaintiffs also attempt to rely on WGH's Notice of Privacy Practices ("Privacy Practices") posted on its Website to support their claim for breach of implied contract. Am. Compl. ¶¶ 71, 239. But WGH's Privacy Practices is not relevant to Plaintiffs' claim because "they do not allege that they read or were even aware of the policy[,]"—even after the opportunity to amend their complaint. *In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F. Supp. 3d at 534.

would be inequitable to do so without paying for the benefit." *In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F.Supp.3d 514, 537 (M.D. Pa. 2021) (citing *Karden Constr. Servs., Inc. v. D'Amico*, 219 A.3d 619, 628 (Pa. Super. Ct. 2019))

This claim also fails for several reasons. For one thing, Plaintiffs inaccurately allege that they conferred a benefit on WGH when they provided "valuable and sensitive medical information" (Am. Compl. ¶ 251). No allegation whatsoever supports that they provided "medical information; the allegations support only that the Meta Pixel collected website usage data (as amply demonstrated above). For another, the two patient Plaintiffs have not alleged that any of their payment for care as patients went towards getting data privacy and security. (And obviously, non-patients of WGH could not show this.) For example, the Eighth Circuit in *Carlsen* said that because the plaintiff did not explicitly "allege that any specific portion of his subscriber fee went toward data protection or that GameStop agreed to provide additional protection to paid subscribers that it did not also provide to non-paid subscribers," the plaintiff "alleged neither a benefit conferred in exchange for protection of his [personal information], nor has he shown how GameStop's retention of his subscription fee would be inequitable." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 912 (8th Cir. 2016). *See also* *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 968 (7th Cir. 2016) (likewise dismissing unjust enrichment claim based on alleged data privacy violations).

## VIII. COUNT VI: BREACH OF FIDUCIARY DUTY

Plaintiffs plead only conclusory allegations of breach of fiduciary duty. Am. Compl. ¶¶ 257-63. To state a claim for breach of fiduciary duty, a plaintiff must establish that the parties were in a fiduciary relationship. *Clemens v. ExecuPharm, Inc.*, 678 F.Supp.3d 629, 638 (E.D. Pa. 2023) (citing *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 22 (Pa. Super. Ct. 2002)). To establish breach of a fiduciary duty in Pennsylvania, the claimant must demonstrate

"(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit ... [was] a real factor in bring[ing] about plaintiff's injuries." *Opris v. Sincera Reprod. Med.*, 2022 WL 1639417, at *10 (E.D. Pa. May 24, 2022) (citing *Dinger v. Allfirst Fin., Inc.*, 82 F. App'x 261, 265 (3d Cir. 2003); *McDermott v. Party City Corp.*, 11 F.Supp.2d 612, 626 n.18 (E.D. Pa. 1998)).

Visiting a website alone cannot create a fiduciary relationship. That's because fiduciary relationships are "confidential relationships" where "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms." *Opris*, 2022 WL 1639417 at *11. Plaintiff's conclusory allegations to the contrary do not change that legal reality. *See Hartley v. Univ. of Chicago Med. Ctr.*, 2023 WL 7386060, at *2 (N.D. Ill. Nov. 8, 2023) (dismissing claim for breach of fiduciary duty for hospital's use of the Meta Pixel based on merely alleged fiduciary duty when "[p]laintiff has not alleged any specific breach of any confidentiality committed").

Even for those Plaintiffs who are or were WGH patients, no allegations establish breach. Comparison of these allegations to *Opris* shows why these Plaintiffs do not state a claim. In *Opris*, there was breach of a fiduciary relationship between reproductive healthcare providers and their patients when a data breach by hackers exposed personal health information (with particular factual allegations supporting the specific personal health information of "medical diagnosis and treatment information, prescription information, treating and referring physician information, and health insurance information.") *Id.* *2, 11. But here, there are two key differences from *Opris*. First, in *Opris*, specific factual allegations supported the existence of sensitive, personal medical information; the Amended Complaint here at most discusses website

usage data. Second, *Opris* deals with a significant data breach by hackers—not an ordinary website functionality technology like the Pixel.

For these reasons, the breach of fiduciary duty claim must be dismissed.

## IX. COUNT VII: UTPCPL

The UTPCPL provides that "'[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by ... this act ... are hereby declared unlawful' [and] is designed to protect the public from fraud and deceptive business practices." *In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F.Supp.3d 514, 540 (M.D. Pa. 2021) (citing 73 P.S. § 201-3, *Pirozzi v. Penskie Olds–Cadillac–GMC, Inc.*, 413 Pa.Super. 308, 605 A.2d 373, 375 (1992)). "To establish liability under the UTPCPL, a party must prove: '(1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss.'" *Opris v. Sincera Reprod. Med.*, CV 21-3072, 2022 WL 1639417, at *12 (E.D. Pa. May 24, 2022) (citing *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014)).

The Amended Complaint states only conclusory allegations for violations of the UTPCPL. *See* Am. Compl. ¶¶ 264-78. There are no allegations about how WGH "deceived" Plaintiffs or otherwise violated the law, only legal conclusions, as seen:

- "Defendant's acts, practices, and omissions alleged in this Complaint constitute unlawful, unfair, and deceptive acts and practices under the UTPCPL." *Id.* ¶ 268.
- WGH "concealed [ ] information" about the Meta Pixel without stating how. *Id.* ¶ 269.
- WGH was "misrepresenting or omitting material facts to Plaintiffs and the Class regarding the adequacy of [WGH]'s protection of their Private Information" without explaining any details of how. *Id.* ¶ 270.
- WGH's acts "were unethical, oppressive, and unscrupulous" without any supporting details. *Id.* ¶ 272.

All of the preceding are "vague allegations amount[ing] to 'no more than conclusions, [and] are not entitled to the assumption of truth.'" *Santiago*, 629 F.3d at 13 (quoting *Iqbal*, 556 U.S. at 679).

Even after the opportunity to amend, Plaintiffs' are required to, but have not, identified an "ascertainable loss." There are no allegations of "actual loss of money or property." *Opris*, 2022 WL 1639417 at *13 (citations omitted). "These damages must be identifiable," but the Amended Complaint does not identify them. *Id.* Furthermore, the damages "cannot be speculative," but they are as currently alleged. *Id.* "In the data breach context…mere allegations that the plaintiff just spent time 'dealing with' the breach, without alleging costs, is not sufficient." *Id.* (quoting *In re Rutter's Inc. Data Security Breach Litigation*, 511 F. Supp. 3d at 541 ("While Plaintiff Collins dedicated approximately five hours "dealing with" the breach through various "remedial actions," there is no allegation that he lost any money as a result."). Here, there are no allegations that Plaintiff's bought "purchasing credit monitoring and identity theft detection services" *Opris*, at *13, or have spent any time whatsoever dealing with the data collected as in *Rutter*.

Accordingly, the claims under the UTPCPL should be dismissed.

## X. COUNT VIII: VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT, 18 PA. C.S. § 5701, *ET SEQ.* (THE "WIRETAP STATUTE")

### A. Plaintiffs Have No Claim Under the Wiretap Statute or Facts in Support.

Count VIII alleges a violation of Pennsylvania's Wiretap Statute, 18 Pa. C.S. § 5701, *et seq.*, because when people browsed WGH's website some computer code allegedly collected and disclosed users' website usage data including page views, button clicks, and the like. Am. Compl. ¶¶ 264-78. For that, the proposed class seeks *potentially tens of millions of dollars*. *Id.* at ¶ 292; *see also* 18 Pa.C.S.A. § 5725(a)(1-3) (detailing potential damages for a civil action).

In their pursuit of aggregated statutory penalties in a novel context, Plaintiffs would expand the Wiretap Statute dramatically beyond its proper, intended, and historical scope. For almost fifty years, the Wiretap Statute has prohibited secret eavesdropping on private, person-to-person oral and telephonic communications without consent. Here, however, Plaintiffs seek to extend the statute to a website's source code that allegedly tracks clicks, scrolls, and searches on public websites, in the absence of any human-to-human communication. That goes far beyond what the legislature intended when it passed the law in 1978.

Plaintiffs raise several issues of first impression with their claim under the Wiretap Statute. First, does website usage data—including webpage views and button clicks—qualify as "electronic communication?" Second, is computer code a "device?" Traditional tools of statutory interpretation show that the answer to both is no. In addition to their errors of legal interpretation, Plaintiffs' claim fails to plead sufficient facts to state a claim. Finally, under the statute's extraterritoriality rule, the Wiretap Statute does not extend to alleged interceptions that occur outside of Pennsylvania—that is, when devices accessed WGH's Website from outside of Pennsylvania, those fall outside the statute's scope.

## B. Statutory Construction: The Wiretap Statute Does Not Apply.[14]

### *1. Elements.*

Plaintiffs sue under the Wiretap Statute's private cause of action, which provides

> Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication.

---

[14] As a federal court interpreting Pennsylvania law, "the decisions of the Pennsylvania Supreme Court are the authoritative source." *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 216 (3d Cir. 2010). Here, no decisions of that Court interpret the relevant provisions of the Wiretap Statute with reference to interception of website usage data by means of a program run by computer code, so this court must predict how that Court would rule on that issue. *Id.*

18 Pa. C.S.A. § 5725(a). The law defines "[i]ntercept" as "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa.C.S.A. § 5702. Civil liability under the statute requires "intentional violations of the Act by a preponderance of the evidence." *Kline v. Sec. Guards, Inc.*, 159 F. Supp. 2d 848, 856 (E.D. Pa. 2001). Breaking these requirements down into elements, a person violates the statute when (1) a person (2) intentionally (3) intercepts, discloses, or uses (or procures any other person to do so) (4) the contents of any wire, electronic, or oral communication (5) by use of a device. *See also* *Com. v. Proetto*, 771 A.2d 823, 828 (Pa. Super. Ct. 2001), *aff'd*, 837 A.2d 1163 (Pa. 2003) (per curiam).

*2. Wire, electronic, or oral communication: Plaintiffs invoke electronic communication, but they allege only collection and disclosure of "record information" instead of the "contents of communication," and because the statute only covers the latter, their claim fails.*

The Wiretap Statute only applies to wire, electronic, or oral communication. First, some focusing. *A)* Plaintiffs cannot allege "wire communication" because they do not allege any "aural transfer"—that is, a "transfer containing the human voice." 18 Pa.C.S.A. § 5702. *B)* Nor are "oral communication[s]" applicable. *Id.* *C)* So we focus on "electronic communication."

Here, "electronic communication" as defined in the statute does not include Plaintiffs' allegations about the collection and disclosure of website usage data by a snippet of computer code. As defined,

> **"Electronic communication."** Any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system, except:
>
> (1) Deleted.
>
> (2) Any wire or oral communication.
>
> (3) Any communication made through a tone-only paging device.

> (4) Any communication from a tracking device (as defined in this section).

18 Pa.C.S.A. § 5702. This provision must be read with "intercept," which the law defines as "[a]ural or other acquisition of the *contents* of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa.C.S.A. § 5702 (emphasis added). Importantly, the meaning of intercept refers specifically to the *contents* of the communication, *not just the communication itself*. "Contents" is defined as "any information concerning the substance, purport, or meaning of that communication." *Id.* Therefore, in order for someone to be held liable under the Statute, the *contents* of the communication must have been intercepted.[15]

Courts interpreting the statutory requirement of "contents" have distinguished between "'record information' or 'the message conveyed by the communication.'" *Cook v. GameStop, Inc.*, 689 F.Supp.3d 58, 68 (W.D. Pa. 2023) *appeal filed* (3d Cir. Aug. 29, 2023) (citing *Goldstein v. Costco Wholesale Corp.*, 559 F.Supp.3d 1318, 1321 (S.D. Fla. 2021)) (violating the Wiretap Statute "comes down to deciding whether the acquired information can best be characterized as either 'record information' or 'the message conveyed by the communication.'"). Record information means information "regarding the characteristics of the message that is generated in the course of the communication." Intercepting record information alone does not

---

[15] WGH relies on decisions interpreting both Pennsylvania's and the federal wiretap statutes, for the reasons explained by this Court:

> The Supreme Court has recognized that the Wiretap Act is the "Pennsylvania analog" of the [Electronic Communications Privacy Act] ECPA. *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001). Because the relevant provisions and statutory definitions (e.g., "intercept" and "contents") from the Wiretap Act are identical to those in the ECPA, the Court can look to decisions applying those provisions and definitions for guidance. *See Com. v. Proetto*, 771 A.2d 823, 829 (Pa. Super. Ct. 2001) *aff'd*, 837 A.2d 1163 (Pa. 2003); *Popa*, 426 F. Supp. 3d at 120-21.

*Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58, 69 (W.D. Pa. 2023).

create liability under the statute. *See* *Cook*, 689 F.Supp.3d at 69. Plaintiff's contrary interpretation would impermissibly render the distinction between content and non-content in the statute superfluous, thus violating the canon against surplusage. *See* *United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005).

WGH has not intercepted the contents of communications based on the Amended Complaint's allegations. Here, website usage data is merely record information. As explained in *Cook*, "mouse movements and clicks, keystrokes, and URLs of web pages visited" do not "constitute[ ] the 'content' of 'communications.'" *Cook*, 689 F.Supp.3d at 70. Likewise, the court in *Goldstein* held that the website user's "(1) [ ] movements on the website ('mouse clicks and movements,' 'scroll movements,' and 'pages and content viewed') and (2) information voluntarily input ('keystrokes,' 'copy and paste actions,' 'search terms,' and 'information inputted by Plaintiff')…did not convey the substance of any communication. Rather, this mere tracking of Plaintiff's movements on Defendant's website is the cyber analog to record information Defendant could have obtained through a security camera at a brick-and-mortar store." *Goldstein*, 559 F.Supp.3d at 1321. Recordings of webpages and content viewed by a website user constitute record information too. *See* *Id.* at 1321-22 (collecting cases).

Similarly, as alleged, WGH collected only record information in the form of website usage data by using the Meta Pixel. Because that data does not qualify as the contents of any communication, Plaintiffs' claim under the Wiretap Statute should be dismissed.

*3. Computer code is not a "device."*

Plaintiff must also allege the "use" of a "device" to intercept the communications' contents "contemporaneous with their transmission." *Proetto*, 771 A.2d at 829. *See also* *Wesley College v. Pitts*, 974 F.Supp. 375, 385 (D. Del. 1997) (interception does not occur absent the use of a device, interpreting definition of intercept in ECPA parallel to Pennsylvania's Wiretap

Statute). Plaintiffs' allege that the Meta Pixel's "source code" functioned as an applicable device. Am. Compl. ¶ 60. But computer code is not a "device" under the statute because it is not physical or tangible, so the claim under the Wiretap Statute should be dismissed.[16]

Only tangible or physical things constitute devices under the Wiretap Statute. Consider first the statute's definition: an "electronic, mechanical, or other device" is "[a]ny device or apparatus, including, but not limited to, an induction coil or a telecommunication identification interception device, that can be used to intercept a wire, electronic, or oral communication…" 18 Pa.C.S.A. § 5702. Merriam-Webster defines "device" as "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." MERRIAM-WEBSTER, DEVICE (2024).[17] An "apparatus" is defined as "a set of materials or equipment designed for a particular use." *Id.*, APPARATUS. Equipment or mechanisms are obviously tangible.

Other words in the statute also indicate that device means something tangible. Under the canon of *noscitur a sociis*, a word is "given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). That "avoid[s]

[16] Irrelevant here are the other alleged "devices" included in the Complaint's laundry list. *See* Am. Compl. ¶ 289. For one thing, as explained above, Plaintiffs irrelevantly allege that applicable devices here were "internet cookies, other pixels, trackers, and/or tracking technology installed on Defendant's Website and/or server, Defendant's computer servers, third-party source code utilized by Defendant, and computer servers of third parties (including Facebook)" (*Id.*) because Plaintiffs do not allege specific facts to support that WGH used any kind of tracking technology except for the Meta Pixel and Google Analytics. *See supra*, nn. 4, 6 (the footnotes in the Relevant Allegations of the Amended Complaint's section about other trackers). For another, the "device" is what does the "intercept[ion]," 18 Pa. C.S.A. § 5702, so "Plaintiffs' and Class Members' personal computing devices, …web browsers, …[and] browser-managed files" (Am. Compl. ¶ 289) by definition cannot constitute devices under the Wiretap Statute. What's more, WGH has no control over Plaintiffs' property or web browsers.

[17] Available at https://www.merriam-webster.com/dictionary/device#:~:text=%3A%20a%20piece%20of%20equipment%20or,or%20perform%20a%20special%20function (last accessed 8/15/2024).

ascribing to one word a meaning so broad that it is inconsistent with" "the company it keeps." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). For instance, the statute explains in its definition of device that it means "[a]ny device or apparatus, *including*, but not limited to, *an induction coil or a telecommunication identification interception device*, that can be used to intercept…" 18 Pa.C.S.A. § 5702 (emphases added). Both induction coils and telecommunication identification interception devices are physical and tangible. Furthermore, the exceptions to device given in the definition are also physical. A device is defined as something "other than: (1) Any telephone or telegraph instrument, equipment or facility, or any component thereof…(2) A hearing aid or similar device…" *Id.* All statutory arrows point one way. The foregoing show that the legislature intended device to mean something tangible or physical.

No Pennsylvania court has interpreted device to mean computer code. Likewise, no Pennsylvania court has interpreted the Meta Pixel or similar kind of computer code to constitute a device under the Wiretap Statute. Instead, quite the opposite. Courts routinely hold that software and receiving servers are not "devices" when interpreting the analogue Federal Wiretap Act and similar state statutes. *See United States v. Ackies*, 918 F.3d 190, 199 n.5 (1st Cir. 2019) ("software is not a 'device' under its plain meaning."); *see also Jacome v. Spirit Airlines Inc.*, 2021 WL 3087860, at *5 (Fla. Cir. Ct. June 17, 2021) (observing that "courts have held that software … [does] not constitute [a] device [] under the wiretapping statutes"); *Connor v. Whirlpool Corp.*, 2021 WL 3076477, at *2 (S.D. Fla. July 6, 2021) (agreeing with *Jacome*);

*Potter v. Havlicek*, 2008 WL 2556723, at * 8 (S.D. Ohio June 23, 2008) (software is not a "device"). [18]

Device meaning something tangible or physical also fits the Wiretap Statute's historical purpose. The legislature was concerned with people physically tapping into telegram, fax, and telephone wires. Computer code sits far outside that historical understanding.

*4. Plaintiffs' interpretation violates the absurdity canon.*

Interpreting "device" to include website code would cause the anomalous result that the entire website becomes a device. There is no meaningful difference between the computer code used to collect a user's interactions with a website for use by analytics tools and the computer code used to program the rest of the website. Plaintiffs' theory of liability thus suggests that every website on the internet—by temporarily recording and storing information to facilitate a user's access to a website—uses a "device" and potentially violates the Wiretap Statute. That interpretation would mean that the Wiretap Statute has elephantine scope. Famously, legislatures do not "hide elephants in mouse holes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). *See also* *In re Processed Egg Prod. Antitrust Litig.*, 610 F. Supp. 3d 697, 702 (E.D. Pa. 2022). Furthermore, websites that use data analytics tools like the Meta Pixel, under that theory, would purportedly embed an intercepting device within an intercepting device—*i.e.*, the Meta

[18] This Court need not follow two decisions discussing whether "Session Replay Code" that tracks and analyzes users' website interactions constitutes a device when both decisions are factually distinguishable and non-binding, unpublished cases. *But see* *Oliver v. Noom, Inc.*, No. 2:22-CV-1857, 2023 WL 8600576, at *6 (W.D. Pa. Aug. 22, 2023); *Schnur v. JetBlue Airways Corp.*, No. 2:22-1621, 2024 WL 2816552, at *1, 9-10 (W.D. Pa. June 3, 2024). Additionally, WGH raises different and additional statutory interpretation arguments about "device" than the defendants in *Oliver* and *Schnur*—here also relying on the canon of *noscitur a sociis*, the absurdity canon, and the rule of lenity; because those two courts never considered those arguments, that further limits their persuasive value. Furthermore, although denying the motion to dismiss in *Noom*, that court explained that "[plaintiffs] will still bear the ultimate burden of showing that the Session Replay Code, as used by Noom, is a 'device.'" *Noom*, 2023 WL 8600576, at *6.

Pixel within the website's source code. Interpreting the Meta Pixel to constitute a device would transform business on the internet and disrupt the use of ordinary technologies in common use. Rather than adopt that absurd result, this Court should hold that computer code is not a device.

*5. The rule of lenity requires dismissing the Wiretap Statute claim.*

The rule of lenity applies in civil cases when the statute invoked has criminal applications. *See* *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 n.10 (1992); *GF Indus. of Missouri, LLC v. Lehigh Valley Genomics, LLC*, 2024 WL 1889797, at *13 n.24 (E.D. Pa. Apr. 30, 2024). This follows because a statute that can be used to pursue both criminal and civil actions must be construed consistently. *See* *Leocal v. Ashcroft*, 543 U.S. 1, 11 n. 8 (2004); *Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*, 703 F. App'x 126, 131 n.131 (3d Cir. 2017). The Wiretap Statute makes violation of its criminal section a felony of the third degree, 18 Pa.C.S.A. § 5703, and key terms including device and intercept apply to both the civil and criminal provisions, so the rule of lenity applies. Therefore, "any ambiguities in the statute should be interpreted strictly and consistently in both the criminal and the civil context," and "ambiguity is resolved in favor of the defendant, which in this case means that the statute should be construed to cover only those who plainly fall within the text." *Aetna Life Ins.*, 703 F. App'x at 131.

Tellingly, no one has been criminally prosecuted under a wiretap statute for using the Meta Pixel. And for good reasons. Prosecutors from diverse jurisdictions across the country—lawyers more familiar with the rule of lenity than civil litigators—have refrained from filing overbroad prosecutions against website hosts like hospitals for using technologies that merely collect website usage data. When a statute is potentially susceptible to a broad meaning, the rule of lenity commands restraint. That restraint applies to Plaintiffs' vastly overbroad and dramatic reading of Pennsylvania's Wiretap Statute.

Thus, for all of these reasons, Plaintiffs' claim under the Wiretap Statute should be dismissed with prejudice.

**C. WGH Did Not Violate the Wiretap Statute Based on the Complaint.**

*1. Plaintiffs plead insufficient facts to support a Wiretap Statute claim.*

Plaintiffs also fail to plead sufficient factual support to state a plausible claim, even if the Court accepts their wrongful statutory interpretation.[19] At most, Plaintiffs allegations about button clicks, page views, and the like amount only to "record information," not the "contents of communications." *Cook*, 689 F.Supp.3d at 69. As detailed above, interception of only record information fails to state a claim.

Courts regularly dismiss claims under the federal wiretap statute (ECPA) based on insufficient factual allegations. *See Murphy v. Thomas Jefferson Univ. Hosps.*, 2023 WL 7017734, at *3 (E.D. Pa. Oct. 10, 2023) (dismissing complaint for use of the Meta Pixel by a hospital when plaintiffs alleged nothing more than "vague allegations amount[ing] to 'no more than conclusions, [and] are not entitled to the assumption of truth'" (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 131 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679)) by alleging communications on "a wide range of personal, private healthcare information," and "personally-identifiable patient health information" including their "medical symptoms, conditions, and concerns, medical appointments, medical tests and test results, doctors' visit notes, medications

[19] To the extent Plaintiffs' claim that the Meta Pixel compiled and disclosed to third parties any information that *WGH sent to Plaintiffs'* (not the opposite), then that claim categorically fails. *See Klump v. Nazareth Area Sch. Dist.*, 425 F. Supp. 2d 622, 633 (E.D. Pa. 2006). That's because the Wiretap Statute only provides a cause of action to the "person whose wire, electronic or oral communication is intercepted, disclosed or used." *Id.* (quoting 18 Pa.C.S.A. § 5725). Therefore, "the cause of action belongs to the person with whom the communication originated, not the recipient." Thus, Plaintiffs lack standing to sue under the Wiretap Statute for any communications allegedly intercepted when sent from WGH to Plaintiffs.

and treatments, and health insurance and medical bills."); *Santoro v. Tower Health*, 2024 WL 1773371, at *3 (E.D. Pa. Apr. 24, 2024) (dismissing complaint for use of the Meta Pixel by regional healthcare provider with hospitals and urgent care facilities when plaintiffs "do not allege, for example, that any specific test results, diagnoses, or sensitive messages were intercepted or improperly disclosed."). Plaintiffs' Amended Complaint should be dismissed because they pleaded legal conclusions, not facts. *See McCulligan v. Pa. State Police*, 123 A.3d 1136, 1141 (Pa. Commw. Ct. 2015), *aff'd*, 135 A.3d 580 (Pa. 2016) (per curiam) (affirming dismissal of complaint under Wiretap Statute when plaintiff failed to plead, *inter alia*, "what information was disclosed").

*2. Extraterritoriality: Plaintiffs that viewed WGH's website from outside Pennsylvania cannot sue under the Wiretap Statute.*

Plaintiffs' and Class Members who accessed WGH's website while outside of Pennsylvania cannot sue under the Wiretap Statute. The statute limits its geographic scope, as explained by the Third Circuit: "intercept[ion]" occurs "at the point where [the defendant] routed those communications to its own servers. And that was at [plaintiff]'s browser, not where the signals were received at [defendant]'s servers." *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 131-32 (3d Cir. 2022). There, the court held that "NaviStone intercepted Popa's communications at the point where it routed those communications to its own servers. And that was at Popa's browser, not where the signals were received at NaviStone's servers." *Id.* Analogously, for a wiretap in the telephone context, an interception occurs where the "to-be-tapped telephone is located." *Id.* (collecting authority).

A constitutional concern also favors an interpretation prohibiting extraterritoriality. Importantly, under the constitutional-doubt canon, a court should avoid interpreting a statute to have unconstitutional applications, and instead, impose a narrowing construction. *See United*

*States v. Grier*, 475 F.3d 556, 567 n.7 (3d Cir. 2007). Namely, allowing extraterritorial application would violate the dormant Commerce Clause because Congress possess plenary power to regulate interstate commerce, exclusive of the states. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). Allowing Pennsylvania to regulate the use of website tracking technologies (like the Meta Pixel) across state lines would intrude on the allocation of power between the states and federal government in derogation of Congress' power.

Therefore, this Court should dismiss claims under the Wiretap Statute by any member of the proposed class who accessed the WGH's Website and Online Platforms from outside of Pennsylvania.

## XI. DISMISSAL SHOULD BE WITH PREJUDICE GIVEN PLAINTIFFS' FAILED ATTEMPT TO AMEND

Dismissal of Plaintiffs' claims should be with prejudice. After conferral with WGH's counsel, Plaintiffs already attempted to cure these alleged deficiencies with its Amended Complaint. ECF Nos. 17-18. But the Amended Complaint still suffers from these pleading deficiencies. And another round of conferral did not produce further amendment. Plaintiffs either cannot cure these deficiencies or, for whatever reason, have chosen not to. Either way, given the prior attempt to cure these deficiencies, any further leave to do so would be futile, and thus the Court should dismiss all claims with prejudice. *See Ramsgate Ct. Townhome Ass'n v. W. Chester Borough*, 313 F.3d 157, 161 (3d Cir. 2002) (affirming dismissal of complaint without granting leave to amend); *Karolski v. Beaver Cty.*, 2016 WL 6647914, at *4 (W.D. Pa. Nov. 10, 2016) ("Given that the Court has already provided Plaintiff with an opportunity to amend, …the Court is not required to provide him with further leave to amend as further amendment would be futile.").

**CONCLUSION**

Based on the foregoing, the Defendant, Warren General Hospital, respectfully requests that the Court dismiss the Complaint, and all counts contained therein, with prejudice.

Respectfully submitted,

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.

BY: /s/*Neal R. Devlin*

Neal R. Devlin, Esq.
PA 89223
ndevlin@kmgslaw.com
Aurora L. Hardin, Esq.
Philip J. Seaver-Hall, Esq.
Mason D. Bracken, Esq.
120 West Tenth Street
Erie, Pennsylvania 16501
Telephone: (814) 459-2800

Attorneys for Defendant,
Warren General Hospital

# 2541371.v1