IN THE UNITED STATES DISTICT COURT
FOR THE WESTERN DISTICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFF BRUNECZ and JULIE ANN CHAPMAN, individually and on behalf of all others similarly situated, **Plaintiff,** | ) ) ) ) | **C.A. No. 24-203 Erie** |
| v. | ) ) ) | **District Judge Susan Paradise Baxter** |
| WARREN GENERAL HOSPITAL, **Defendant.** | ) ) ) | |

**MEMORANDUM OPINION**

## I.  INTRODUCTION

### A.  Relevant Procedural History

On June 17, 2024, Plaintiffs Jeff Brunecz ("Brunecz") and Julie Ann Chapman ("Chapman"), initiated this matter in the Court of Common Pleas of Warren County, Pennsylvania, by filing a putative class action complaint against Defendant Warren General Hospital ("WGH"), both individually and on behalf of all individuals whose private information was allegedly disclosed by WGH to third parties, without authorization, through the use of applications like Meta Pixel and other similar marketing and data applications. [ECF No. 1-2]. WGH subsequently removed the action to this Court by Notice of Removal filed on July 26, 2024. [ECF No. 1].

After WGH filed a motion to dismiss the Plaintiffs' complaint for lack of jurisdiction [ECF No. 14], Plaintiffs filed a first amended class action complaint on September 12, 2024 [ECF No. 19], which is the operative pleading in this case. In general, Plaintiffs allege that WGH engaged in the "improper practice of disclosing the confidential Personally Identifying

1

Information ("PII")[1] and/or Protected Health Information ("PHI")[2] (collectively referred to as "Private Information") of Plaintiffs and proposed Class Members, via tracking technologies used on its website, to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"), Google, LLC ("Google"), Microsoft, DoubleClick, StackAdapt, Hotjar, Salesforce CrazyEgg, and potentially others ("the Disclosure")." (ECF No. 19, at ¶ 1). The amended complaint sets forth eight causes of action under Pennsylvania state law: (I) negligence; (II) negligence per se; (III) invasion of privacy; (IV) breach of implied contract; (V) unjust enrichment; (VI) breach of fiduciary duty; (VII) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. C.S. §§ 20101, *et seq*, and (VIII) violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. C.S. §§ 5701, *et seq.*

Presently pending before the Court is WGH's motion to dismiss all claims for failure to state a claim upon which relief may be granted. [ECF No. 26]. Plaintiffs have filed a brief in opposition to WGH's motion [ECF No. 30], and WGH has filed a reply brief [ECF No. 36]. This matter is now ripe for consideration.

---

[1] Plaintiffs define PII based on the Federal Trade Commission's definition of "identifying information" – "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "name, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." (ECF No. 19, at ¶ 1 n. 1, quoting 17 C.F.R. § 248.201(b)(8)).

[2] Plaintiffs define PHI using the definition of "protected health information" under the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d et seq., and its implementing regulations ("HIPAA") – "individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations." (ECF No. 19, at ¶ 1, n. 2, quoting 45 C.F.R. § 160.103)).

**B.    Relevant Factual History**[3]

WGH is a well-regarded Pennsylvania healthcare provider headquartered in Warren, Pennsylvania, which provides a wide range of medical services, including emergency care, surgery, rehabilitation, and specialized treatments. (ECF No. 19 at ¶¶ 5, 31, 35-37). Like many healthcare providers, WGH maintains an online platform and website, which it encourages patients to use to, among other things, search for services, research medical conditions, search for physicians, make payments, and access a patient portal. (Id. at ¶ 7). WGH embedded in its website certain code-based tracking technologies known as "pixels" (also referred to as "trackers"), which tracked information about its visitors and their interactions with the website. (Id. at ¶¶ 6, 9).[4] Thus, when a person visited its website, the pixels tracked "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted, and then transmitted these events back to the website server and to third parties, where they could be combined with other data and used for marketing. (Id. at ¶ 9).

Among the trackers WGH embedded into its website was the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"), which is able to track information about a user's device, including his or her IP address, the content the user viewed, the user's searches, and the

---

[3] For purposes of the pending motion, the court accepts all well-pleaded facts in the amended complaint as true and construes them in the light most favorable to the Plaintiffs. Barclift v. Keystone Credit Servs., LLC, 93 F.4th 136, 141 (3d Cir. 2024).

[4] Notably, Plaintiffs allege that "WGH does not presently install any trackers but WGH previously installed Google Analytics with Google Tag Manager and a Meta Pixel to disclose Plaintiffs' and Class Members' Private Information and confidential communications to third parties for marketing purposes, including Facebook and Google." (ECF No. 19, at ¶ 78). Nonetheless, through WGH's prior installation of Google Analytics and Meta Pixel, Plaintiffs' allege that "WGH disclosed its patients' data to Google from at least as early as November 23, 2016 through as recently as February 1, 2023 and to Facebook from at least as early as January 2, 2024 through as recently as April 5, 2024." (Id. at ¶ 82).

user's patient related activities, and then link that information with the user's Facebook profile. (Id. at ¶ 10, 17). WGH utilized data from these trackers to market its services and bolster its profits, while Facebook used the data to create targeted advertisements for the users based on their medical conditions and other information disclosed to WGH. (Id. at 16). Thus, "the Meta Pixel's primary purpose is for marketing and ad targeting and sales generation." (Id. at ¶ 48).

Plaintiffs Brunecz and Chapman are patients of WGH who have received healthcare services from WGH for various medical conditions. (Id. at ¶¶ 114-134). Both Plaintiffs used WGH's website and online platforms to search for treatment and medical information, to search topics related to finding a doctor for specialized treatment, to schedule appointments, and to pay for treatment (Id. at ¶¶ 115, 125). As a result, Plaintiffs allege that, through its use of the Meta Pixel and other tracking Technologies, WGH disclosed to Facebook :

1. the pages and content Plaintiffs viewed;
2. Plaintiffs' seeking of medical information;
3. Plaintiffs' status as patients;
4. information regarding Plaintiffs' patient portal activity;
5. the specialties of the medical providers Plaintiffs searched for and viewed;
6. the names of the medical providers Plaintiffs searched for and viewed;
7. the search results that Plaintiffs clicked on;
8. the medical services Plaintiffs viewed; and
9. Plaintiffs' identities via their IP addresses and/or "c_user" cookies[5] and/or Facebook IDs

(Id. at ¶¶ 120, 130). Consequently, Plaintiffs allege that they began receiving targeted advertisements for products related to the specialized treatment they were searching on WGH's website. (Id. at ¶¶ 116, 126). Plaintiff Brunecz discovered that "WGH was unauthorizedly

---

[5] In each Meta Pixel event transmitted by WGH to Facebook, WGH includes a "c_user" cookie, which allows Facebook to identify WGH patients and, thus, connect cookie data that WGH transmits with specific patients. (ECF No. 19, at ¶ 85).

disclosing his Private Information to Facebook via the Meta Pixel and other trackers on or around November 2023", while Defendant Chapman made the same discovery "on or around December 2023." (Id. at ¶¶ 123, 133). As a result, they claim to have suffered, *inter alia*, loss of privacy, embarrassment, humiliation, frustration, emotional distress, devaluation of their personal information, "lost benefit of the bargain," and "increased risk of future harm resulting from future use and disclosure of [their] Private Information." (Id. at ¶¶ 122, 132).

## II.    DISCUSSION

### A.    WGH's Disclosure of Protected Confidential Information

WGH first argues that "the tracking technologies at issue operated only on the unauthenticated [public] parts of [WGH's] website" and did not disclose any of the type of confidential information protected by HIPAA. (ECF No. 27, at pp. 10-12; ECF No. 36, at pp. 2-3). In making this argument, WGH urges the Court to follow the reasoning of American Hospital Association v. Becerra, 738 F. Supp. 3d 780 (N.D. Tex. 2024). (ECF No. 27, at pp. 10-12).

The Becerra case concerned HIPAA's confidentiality protections (the "Privacy Rule") insofar as the Rule applied to a subset of PHI referred to as "individually identifiable health information" ("IIHI"). HIPAA generally defines IIHI as information that (1) "relates to" an individual's healthcare and (2) "identifies the individual" or provides "a reasonable basis to believe that the information can be used to identify the individual." Becerra, 738 F.Supp.3d at 788; 42 U.S.C. § 1320d(6). In December 2022, the Department of Health and Human Services ("HHS") issued a guidance document (the "Original Bulletin") to address privacy concerns associated with online technology that connects (1) an individual's IP address with (2) a visit to

an unauthorized public webpage[6] addressing specific health conditions or healthcare providers (referred to as the "Proscribed Combination"). Id. at 789. Then, in 2024, the HHS issued a "Revised Bulletin" that "insinuate[d] that information can *become* IIHI if the individual's *reason* for visiting [an unauthenticated public webpage] relates to their personal healthcare." Id. (emphasis in original). Specifically, the Revised Bulletin provided that the Proscribed Combination under the Original Bulletin was "a sufficient combination of information to constitute IIHI *if* the visit to the webpage … is related to the individual's own health." Id. at 792 (emphasis in original). Thus, under the Revised Bulletin, the determination of whether particular information constituted IIHI was dependent upon the user's subjective intent in seeking such information on the webpage – i.e., it must have been sought for the purpose of addressing the user's own health or medical condition.

The plaintiffs in Becerra, consisting of "two hospital associations and a regional healthcare system," sued to stop the enforcement of the Privacy Rule as promulgated under both the Original Bulletin and the Revised Bulletin, as well as the Proscribed Combination thereunder. After due consideration of the contours of the Revised Bulletin and the Proscribed Combination thereunder, the Becerra court ultimately found:

> because the individual does not also transmit their subjective intent in using or searching for a webpage to the healthcare entity that owns the webpage, the Proscribed Combination is not IIHI…. [T]he law is clear that '**[h]ealth information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify the individual is not [IIHI].**'

---

[6] An "unauthorized public webpage" is one that does not require login credentials or user verification. Becerra, 738 F.Supp.3d at 789.

Id. at 803-04, quoting 45 C.F.R. § 164.514 (emphasis added). Accordingly, the court found the Proscribed Combination, as set forth in the Revised Bulletin, to be unlawful and ordered it to be vacated. Id. at 807.[7]

As a result of Becerra's vacation of the Revised Bulletin and the Proscribed Combination thereunder, WGH argues that "third-party tracking technologies that collect merely website usage data are permitted on unauthenticated webpages," and because the trackers allegedly used by WGH only operated on the unauthenticated parts of its website, no protected confidential information of Plaintiffs was improperly disclosed. (ECF No. 27, at pp. 11-12). However, WGH's interpretation of the effect of the Becerra decision is far too expansive.

As the United States District Court for the Northern District of Illinois has aptly observed,

> Context matters, and the *Becerra* court was considering generally applicable HHS guidance about public websites, not specific allegations about specific individuals' use of specific websites. Thus, its holding that information collected from public healthcare websites does not *always* amount to individually identifiable health information does not also mean that information from public websites can *never* amount to such information.

Hartley v Univ. of Chicago Med. Center, 2025 WL 2802317, at *4 (N.D. Ill. Oct. 1, 2025) (emphasis in original), citing Becerra, 738 F.Supp.3d at 803.

In particular, the Hartley court found that "[t]he act of logging into a healthcare provider's patient portal, when combined with individual identifiers such as an IP address or a Facebook ID, can reveal patient status," and that a user's patient status "constitutes individually identifiable

---

[7] As WGH correctly points out, HHS withdrew its appeal of the Becerra ruling to the Fifth Circuit Court of Appeals on August 29, 2024, thus solidifying the vacation of the Revised Bulletin and the Proscribed Combination thereunder. (ECF No. 27, at p. 11).

health information [that] 'falls within the ambit of information protected under HIPAA." Hartley, at *3, quoting In re Meta Pixel Healthcare Litig., 647 F. Supp. 3d 778, 792 (N.D. Cal. 2022) (where the court held that "the act of clicking the 'Log in' button [to access a healthcare provider's private patient portal] ... sufficiently identif[ied] [the plaintiff] as a patient"); see also Nienaber v. Overlake Hosp. Med Ctr., 2025 WL 692097, at *6 (W.D. Wash. Mar. 4, 2025) (finding that disclosure of the plaintiff's patient status with the defendant [through log in to private patient portal] "ma[de] her other interactions with [the defendant's] website, such as searching for particular physicians or researching specific medical conditions, clearly related to the provision of healthcare by [the defendant] to [the plaintiff]" and, thus, "constitute[d] protected information").

Moreover, in J.C. v. Catholic Health Sys. Inc., 2024 WL 5136236 (W.D.N.Y. Aug. 29, 2024), the court noted that the Becerra court addressed allegations involving the disclosure of only the user's IP address, which identifies a specific device, but did not address allegations involving disclosure of "potential IIHI along with an individual's Facebook ID, which very specifically identifies an actual individual." J.C., at *14. Thus, the court found the Becerra court's reasoning neither persuasive nor controlling. Id.; accord Nienaber, 2025 WL 692097, at *5. See also Vriezen v. Infinite Health Collaborative, P.A., 2025 WL 2992204, at *6 (D. Minn. Sept. 30, 2025), quoting Kane v. Univ. of Rochester, 2024 WL 1178340, at *6 (W.D.N.Y. Mar. 19, 2024) (finding "It is plausible that the information transmitted when a user requests an appointment ... is information that is "received by a health care provider" that "relates to ... the provision of health care to an individual," i.e., the requested appointment, and "with respect to which there is a reasonable basis to believe that the information can be used to identify the individual'").

8

Here, Plaintiffs have alleged that they used WGH's website to schedule appointments (ECF No. 19, at ¶¶ 115, 125), and that, through its use of the Meta Pixel, WGH disclosed to Facebook, among other things, their status as WGH patients and their identities via their "IP addresses and/or "c_user cookies, and/or Facebook IDs" (Id. at ¶¶ 120, 130). Thus, under the foregoing case authority, the Court finds that Plaintiffs have sufficiently alleged that their IIHI was improperly disclosed through their use of WGH's website, at the pleading stage.

Having so found, the Court now turns to WGH's argument that Plaintiffs lack Article III standing to bring their claims.

### B.    Article III Standing

WGH argues that this action must be dismissed because Plaintiffs lack Article III standing in two different ways: (1) Plaintiffs have not alleged an injury that meets Article III's concreteness requirement; and (2) there is no reasonable likelihood of recurring injury, so Plaintiffs lack standing for injunctive relief. A motion to dismiss predicated on a lack of standing presents a jurisdictional matter and thus is "properly brought pursuant to Rule 12(b)(1)." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007).

### 1.    Standard of Review – Fed.R.Civ.P. 12(b)(1)

Two types of challenges to the court's subject matter jurisdiction can be asserted under Rule 12(b)(1) - facial or factual. In re Horizon Healthcare Servs. Inc. Data Breach Litig., 846 F.3d 625, 632 (3d Cir. 2017), citing Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016)). "[A] facial attack 'contests the sufficiency of the pleadings, . . . whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'" The Constitution Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014) (internal citations omitted). Here, WGH is bringing a facial challenge to Plaintiffs' standing.

"In reviewing a facial attack, 'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'" Id., quoting In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012) (other citation omitted). Thus, a facial challenge requires the court to apply the same legal standard it would apply in ruling on a motion to dismiss under Rule 12(b)(6). Id., citing In re Schering Plough Corp., 678 F.3d at 243. Consequently, "'[t]o survive a motion to dismiss [for lack of standing], a complaint must contain sufficient factual matter' that would establish standing if accepted as true." In re Horizon Healthcare Servs., 846 F.3d at 633, quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). At the pleading stage, the plaintiff bears the burden of establishing that he has standing to sue. Reilly v. Ceridian Corp., 664 F.3d 38, 41 (3d Cir. 2011), citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3d Cir. 2003).

In order to have standing under Article III of the Constitution, a plaintiff must demonstrate: "(1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." Clemens v. ExecuPharm Inc., 48 F.4th 146, 152 (3d Cir. 2022) citing Thole v. U.S. Bank N.A., 590 U.S. 538, 540 (2020).

### 2.    Injury in Fact

"'In the context of a motion to dismiss, [the Third Circuit Court has] held that the [i]njury-in-fact element is not Mount Everest. The contours of the injury-in-fact requirement, while not precisely defined, are very generous, requiring only that claimant allege[ ] some specific, identifiable trifle of injury.'" In re Horizon Healthcare Serv., Inc. Data Breach Litigation, 846 F.3d 625, 633 (3d Cir. 2017), quoting Blunt v. Lower Merion Sch. Dist., 767 F.3d

247, 278 (3d Cir. 2014). "'At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Id. at 633-34, quoting Lujan, 504 U.S. at 561.

Here, WGH is challenging only the first element of Article III standing - specifically, whether Plaintiff suffered an injury in fact that is "sufficiently concrete." (ECF No. 27, at pp. 12-14). In Spokeo, Inc. v. Robins, 578 U.S. 330 (2016), the Supreme Court provided guidance as to what constitutes a concrete injury - "[a] 'concrete' injury must be 'de facto'; that is, it must actually exist." Id. at 340 (citations omitted). However, the term "concrete" does not necessarily mean tangible, as "[v]arious intangible harms can also be concrete," including "disclosure of private information." TransUnion LLC v. Ramirez, 594 U.S. 413, 425 (2021).

Here, Plaintiffs seek damages for the unauthorized dissemination of their own private medical information, which is the very injury that HIPAA was enacted to prevent. The Third Circuit Court has recognized that "'Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private.'" Horizon Healthcare, 846 F.3d at 636 quoting In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 274 (3d Cir. 2016) (concluding that the "unlawful disclosure of legally protected information" in and of itself constitutes a "*de facto* injury"). In particular, the disclosure of private medical information to third parties through the use of tracking software embedded in a healthcare provider's website has been found to establish a concrete injury for purposes of Article III standing. See e.g. Rodriguez v. FastMed Urgent Care, P.C., 741 F.Supp3d 352, 360-61 (E.D.N.C. 2024) (finding that plaintiff "plausibly alleged concrete injury in her federal claim to support Article III standing" where plaintiff claimed that Meta Pixels used on

11

defendant's website disclosed plaintiff's HIPAA-protected medical information and patient status to third parties); Doe v. Regents of Univ. of California, 672 F.Supp.3d 813, 818-819 (N.D. Cal. 2023) (finding allegation that plaintiff began receiving targeted health-related advertisements related to her medical condition on Facebook after her private medical information was transmitted to Meta was sufficient to plead an injury-in-fact); Doe v. Shady Grove Reproductive Science Center, P.C., 2025 WL 2781542 at *3 (D. Md. Sept. 30, 2025) (finding allegations that defendant effectively directed that plaintiffs' personally identifiable health information be transmitted to third parties through the use of tracking software on its website was "sufficient to allege a cognizable injury in fact" for purposes of establishing Article III standing).

The Court agrees with the reasoning of the foregoing cases and, thus, finds that Plaintiffs' allegations concerning WGH's unauthorized dissemination of their private medical information to third parties sufficiently allege a concrete injury for purposes of establishing Article III standing. Thus, WGH's motion to dismiss Plaintiffs' claims for lack of standing, insofar as they seek monetary damages, will be denied.

### 3.   Injunctive Relief

Notwithstanding the foregoing, WGH also moves to dismiss Plaintiffs' claims for injunctive relief based on a lack of Article III standing.

Plaintiffs seeking injunctive relief bear the burden of establishing that they are "'likely to suffer future injury' from the defendant's conduct." In re Johnson & Johnson Talcum Powder Prods. Mktg. Sales Practices & Liab. Litig., 903 F.3d 278, 292 (3d Cir. 2018), quoting McNair v. Synapse Grp., Inc., 672 F.3d 213, 223 (3d Cir. 2012). "In the class action context, that requirement must be satisfied by at least one named plaintiff." McNair, 672 F.3d at 223,

citing <u>Warth v. Seldin</u>, 422 U.S. 490 (1975). Conjectural or speculative injuries are not enough to satisfy Article III. <u>Id</u>. at 225.

Here, WGH argues that Plaintiffs' future injuries are "speculative at best and implausible at worst." (ECF No. 27, at p. 15). The Court agrees. As WGH notes, Plaintiffs openly acknowledge in their amended complaint that "WGH does not *presently* install any trackers, but WGH *previously* installed Google Analytics with Google Tag Manager and a Meta Pixel to disclose Plaintiffs' and Class Members' Private Information and confidential communications to third parties for marketing purposes, including Facebook and Google." (ECF No. 19, at ¶ 78) (emphasis added). More specifically, Plaintiffs' allege that "WGH disclosed its patients' data to Google from at least as early as November 23, 2016 through as recently as February 1, 2023 and to Facebook from at least as early as January 2, 2024 through as recently as April 5, 2024." (<u>Id</u>. at ¶ 82). Thus, Plaintiffs' allegations pertain to unauthorized disclosure of their private medical information through the use of tracking software on WGH's website during a closed period of time that occurred prior to the filing of this lawsuit. Accordingly, any allegations of future injury stemming from WGH's use of trackers on its website is purely conjectural and fails to satisfy Article III's standing requirement for injunctive relief.[8] Plaintiffs' requests for injunctive relief

---

[8] The Court notes that WGH's principal argument regarding the speculative nature of Plaintiffs allegations of future injury is unpersuasive. According to this argument, WGH asserts that Plaintiffs "are not likely to use [WGH's] website again" because they "are now well aware of the alleged privacy risks that purportedly accompany [WGH's] web-based services." (ECF No. 27, at pp. 15-17). In short, unlike the plaintiffs in the line of cases cited by WGH in support of this argument, Plaintiffs in this case are not former customers or consumers within a retail context, but are current patients of WGH that uses its online platforms as one of its primary means of serving its patients. Thus, WGH's attempt to argue that "informed" patients like Plaintiffs would not be expected to continue to access WGH's website based on their knowledge of the presence (or potential presence) of tracking software is impractical, at best.

will, therefore, be dismissed, without prejudice.[9]

The Court now turns to the evaluation of each of Plaintiffs' claims.

## C.   Negligence

"A plaintiff advancing a negligence claim under Pennsylvania law must allege facts plausibly demonstrating: (1) the existence of 'a duty to conform to a certain standard for the protection of others against unreasonable risks;' (2) that the defendant 'fail[ed] to conform to that standard;' (3) a causal connection between the conduct and the resulting injury to the plaintiff; ad (4) "actual loss or damage to the plaintiff." Doe v. Post Acute Medical, LLC, 2025 WL 511069, at *7 (M.D. Pa. Feb. 14, 2025), quoting Brewington *ex rel.* Brewington v. City of Philadelphia, 199 A.3d 348, 355 (Pa. 2018).

Here, WGH argues that Plaintiffs have failed to establish any of the three elements of their negligence claim – duty, causation, or damages. Thus, each of these three elements will be addressed in turn.

### 1.   Duty

Plaintiffs allege that WGH owed then "a duty to exercise reasonable care in handling and using Plaintiffs' and Class Members' Private Information in its care and custody." (ECF No. 19, at ¶ 207). WGH asserts that Plaintiffs' allegations fall short of establishing a legal duty because "website usage data like IP addresses, internet cookies, and website views ... are not specific and sensitive information covered by any common law duty." (ECF No. 27, at p. 18). In support of this assertion, WGH cites Santoro v. Tower Health, 2024 WL 1773371 (E.D. Pa. Apr. 24, 2024), where the court dismissed the plaintiffs' negligence claim based on the disclosure of their

---

9

Dismissal for lack of Article III standing is generally without prejudice. See, e.g., Ellison v. Am. Bd. of Orthopedic Surgery, 11 F.4th 200, 209 (3d Cir. 2021).

personal information through the alleged operation of the Meta Pixel on the defendant's website; however, Santoro is inapposite, as the court's dismissal was based on its finding that plaintiffs' complaint "lack[ed] allegations spelling out what information the Meta Pixel collected" and, thus, the court had "no basis to conclude that a duty existed to safeguard the information." Id. at *5. Such is not the case here.

As noted previously, Plaintiffs' have specifically alleged that the information collected by the Meta Pixel on WGH's website included, *inter alia*, Plaintiffs' status as patients; information regarding their patient portal activity; the specialties and names of the medical providers they searched for and viewed; the medical services they viewed; and "their identities via their IP addresses and/or "c_user" cookies and/or Facebook IDs." (ECF No. 19, at ¶¶ 120, 130). The Court has already found that this information would constitute individually identifiable health information that falls within the ambit of information protected under HIPAA. Moreover, Plaintiffs have alleged that "WGH's Privacy Policies [do not] permit [WGH] to disclose patients' PHI/Private Information to third-parties uninvolved in their treatment for marketing purposes, without their written authorization." (Id. at ¶¶ 72-73).

By these allegations, Plaintiffs have sufficiently established at the pleading stage that WGH had a legal duty to use reasonable care to protect Plaintiffs' personal medical information collected on its website. See Dittman v. UPMC, 196 A.3d 1036 (Pa. 2018) (in a data breach case, imposing a duty on an employer collecting employees' "personal and financial information" to "exercise reasonable care in collecting and storing" the information); Zimmerman v. Highmark, Inc., 780 F.Supp.3d 588, 603 (W.D. Pa. 2025) (health insurance and healthcare provider have common law duty to safeguard patents' private health information); Smart v. Main Line Health, 2026 WL 1008171, at *4 (E.D. Pa. Apr. 14, 2026) (finding that defendant's "publication of a

privacy policy, which promised patients that their private information would not be used without written permission, suffices at [the pleading] stage to establish that [defendant] assumed a duty to keep private patients' health information and other sensitive information); Murphy v. Thomas Jefferson Univ. Hospitals, Inc., 2023 WL 7017734, at *5 (E.D. Pa. Oct. 10, 2023) (finding that plaintiffs plausibly alleged that defendant owed them a duty of care to protect personal information via the publication of its privacy policies).

### 2. Causation

WGH also argues that Plaintiffs have not plausibly pleaded causation because they "cannot allege" that the targeted ads they received for certain categories of health treatment "were related to Plaintiffs' activity on the WGH website." (ECF No. 27, at p. 18). This argument is specious at best. Most notably, Plaintiffs specifically allege that, "after Plaintiff Brunecz used the Online Platforms, to schedule appointments, to search for treatment information, doctors, to pay for medical services, to research treatments, to use the Patient Portal, and to look for a doctor for a colonoscopy, his Facebook feed was *immediately* bombarded with advertisements for "Cologuard." (ECF No. 19, at ¶ 116). This allegation, in particular, is sufficient to establish causation at the pleading stage. See, e.g., Doe v. Regents of Univ. of California, 672 F.Supp.4d 813 (N.D. Cal. 2023) (finding plaintiff's allegations showing a one-for-one correlation between the specific medical information she researched on defendant's website and the topics of the advertisements she received after accessing the website was sufficient to establish causation).

### 3. Damages

WGH argues that Plaintiffs "have not articulated any damages with the requisite specificity," noting that "Federal district courts in Pennsylvania have routinely treated allegations that plaintiffs "'suffered damages,' including 'embarrassment, humiliation, emotional harm, and

16

distress'" as merely "boilerplate" and without "facts to support them." (ECF No. 27, at p. 19, citing Murphy, 2023 WL 7017734, at *5). However, Plaintiffs' damage allegations are not so confined.

Among the damages Plaintiffs seek to recover are the "lost value of their Private Information" and the "lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence." (ECF No. 19, at ¶¶ 213).[10] As the court in Smart recently reaffirmed, "'several courts have recognized the property value of personal information' and that the 'alleged loss of value to [a plaintiff's] PII and PHI' is properly understood as a negligence injury...." Smart, 2026 WL 1008171, at *5, quoting Opris v Sincera Reproductive Medicine, 2022 WL 1639417, at *8 (E.D. Pa. May 24, 2022) (collecting cases). In addition, allegations of mitigation damages have also been found sufficient for a negligence claim to survive a motion to dismiss. Zimmerman, 780 F.Supp.3d at 603, citing Opris, 2022 WL 1639417, at *7. Thus, the Court finds that Plaintiffs' damage allegations are sufficient to support their negligence at the pleading stage.

For the foregoing reasons, therefore, WGH's motion to dismiss Plaintiffs' negligence claim will be denied.

### D.    Negligence *Per Se*

Plaintiffs allege that WGH's conduct violated both the FTC Act and HIPAA and that these violations constitute negligence *per se*. (ECF No. 19, at ¶¶ 215-227). Faced with substantially similar claims in Zimmerman, the Honorable J. Nicholas Ranjan noted that "Pennsylvania does not recognize a claim for negligence *per se* based on statutes without a

---

10
Plaintiffs include several allegations supporting their claim of lost value of their Private Information. (ECF No. 19, at ¶¶ 177-184)

17

private right of action, and neither of these statutes provides for private causes of action."
Zimmerman, 780 F.Supp.3d at 603, citing In re Am. Med. Collection Agency, Inc., 2021 WL
5937742, at *17 n. 32. In addition, Judge Ranjan observed that negligence *per se* is not a
separate cause of action under Pennsylvania law" and is, instead "a theory of liability that
supports a negligence claim." Id. (internal citations omitted). Thus, "[c]ourts routinely dismiss
negligence *per se* claims 'as subsumed within the standard negligence claim.'" Id., quoting In re
Rutter's Inc. Data Security Breach Litig., 511 F.Supp.3d 514, 531 (M.D. Pa. 2021) (collecting
cases).

This Court adopts Judge Ranjan's above findings and, as in Zimmerman, will dismiss
Plaintiffs' negligence *per se* claim, without prejudice to Plaintiffs' ability to advance this theory
of liability as part of their standard negligence claim.

### E.    Invasion of Privacy

Plaintiffs claim that WGH's unauthorized disclosure of their Private Information to third
parties through the operation of tracking technologies on its website was an "intentional intrusion
on Plaintiffs' solitude or seclusion" and, thus, violated their expectation of privacy in a way that
was highly offensive to a reasonable person. (ECF No. 19, at ¶¶ 229-233). This type of invasion
of privacy claim is recognized under Pennsylvania law as an "unreasonable intrusion upon the
seclusion of another." See Burger v. Blair Med. Assocs., Inc., 964 A.2d 374, 376–77 (Pa. 2009),
citing Restatement (Second) of Torts §§ 652B–E (1977).

"To state a claim for intrusion upon seclusion, plaintiffs must allege conduct
demonstrating 'an intentional intrusion upon the seclusion of their private concerns which was
substantial and highly offensive to a reasonable person, and aver sufficient facts to establish that
the information disclosed would have caused mental suffering, shame or humiliation to a person

18

of ordinary sensibilities.'" Boring v. Google, Inc., 362 Fed. Appx. 273, 278-79 (3d Cir. 2010), quoting Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809 A.2d 243, 247 (Pa. 2002) (citations omitted). "The harm for this tort 'consists solely of an intentional interference with the plaintiff's interest in solitude or seclusion, either as to his person or as to his private affairs or concerns.'" Adair v. Cigna Corporate Servs. LLC, 818 F.Supp.3d 641, 659-60 (E.D. Pa. 2026), quoting Cook v. GameStop, Inc., 148 F.4th 153, 160 (3d Cir. 2025). "Unlike other privacy torts, the injury does not turn on the exposure or the use of private information. Nor does it 'depend upon any publicity given to the person whose interest is invaded or to his affairs.'" Id., quoting Restatement (Second) of Torts § 652B cmt. a (1977).

Here, Plaintiffs' allegations plainly meet the pleading standards of an intrusion upon seclusion claim. Nonetheless, WGH argues that Plaintiffs' allegations are insufficient because "mere website usage does not measure up to this tort," and "neither named Plaintiff alleges that their Website use caused collection or disclosure of any *particular* medical diagnosis, prescribed medication, patient's charts, specific symptoms, payment records, personal financial information, or individual medical records." (ECF No. 27, at p. 26) (emphasis in original). However, as Plaintiffs correctly point out, WGH has cited "no authority for the proposition that a 'particular medical diagnosis' must be disclosed through website use to state an intrusion upon seclusion claim" because "none exists." (ECF No. 30, at p. 24). At base, WGH is essentially restating its central argument that the information disclosed through the use of the Meta Pixel was not IIHI or Private Information. The Court has already considered and rejected this argument, finding that Plaintiffs have sufficiently alleged that the information disclosed was confidential health information over which Plaintiffs had an expectation of privacy. Thus, WGH's motion to dismiss this claim will be denied.

19

**F.**     **Breach of Implied Contract**

Plaintiffs allege that "[a]s a condition of receiving medical care from WGH, [Plaintiffs] provided their Private Information and paid compensation for the treatment received," thus creating implied contracts with WGH "by which [WGH] agreed …, in its Privacy Policies and elsewhere, to keep such information secure and confidential," and that "WGH beached the implied contracts with [Plaintiffs] by disclosing [Plaintiffs'] Private Information to an unauthorized third party." (ECF No. 19, at ¶¶ 239, 245).

"The essential elements of breach of implied contract are the same as an express contract, except the contract is implied through the parties' conduct, rather than expressly written." Zimmerman, 780 F.Supp.3d at 605, quoting Enslin v. The Coca-Cola Co., 136 F. Supp. 3d 654, 675 (E.D. Pa. 2015), aff'd sub nom. Enslin v. Coca-Cola Co., 739 Fed. Appx. 91 (3d Cir. 2018). "Corporate policies, such as the Notice of Privacy Practices, can form the basis for implied promises." Id., citing Farmer v. Humana, Inc., 582 F. Supp. 3d 1176, 1187-88 (M.D. Fla. 2022) (declining to dismiss a breach of implied contract claim because the plaintiff handed over sensitive information); Purvis v. Aveanna Healthcare, LLC, 563 F. Supp. 3d 1360, 1381-82 (N.D. Ga. 2021) (declining to dismiss an implied contract claim because "Plaintiffs specifically point[ed] to Defendant's Privacy Policy as one indication of Defendant's intent to enter into an implied contract that included a promise to 'reasonably protect' Plaintiffs' private information.").

Here, Plaintiffs plead the existence and relevant aspects of WGH's Privacy Policy, which plausibly plead the essential terms of an implied contract to safeguard Plaintiffs' Private Information, including WGH's promise that "[n]ormally, we will require your signed authorization before disclosing your medical information outside the hospital, unless it is required by law." (ECF No. 19, at ¶¶ 71-74). Further, Plaintiffs sufficiently allege a breach of

this implied contract stemming from the unauthorized disclosure of Plaintiffs' Private Information to a third party. These allegations are enough to state a claim of breach of implied contract at the pleading stage. WGH's motion to dismiss this claim will, therefore, be denied.

### G.    Unjust Enrichment

As an alternative to their implied contract claim, Plaintiffs also bring a claim of unjust enrichment. To state a claim for unjust enrichment under Pennsylvania law, a plaintiff must allege "(1) that the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under circumstances in which it would be inequitable to do so without paying for the benefit." In re Rutter's Inc. Data Sec. Breach Litig., 511 F.Supp.3d 514, 537 (M.D. Pa. 2021), citing Karden Constr. Servs., Inc. v. D'Amico, 219 A.3d 619, 628 (Pa. Super. 2019).

Here, Plaintiffs have essentially alleged that they conferred their PHI upon WGH, who promised not to disclose it, but then proceeded to disclose Plaintiffs' PHI to third parties, without Plaintiffs' authorization, and received a monetary benefit from such disclosure, which it retained at Plaintiffs' expense. (ECF No. 19, at ¶¶ 251-255). WGH argues that this claim should be dismissed because Plaintiffs "inaccurately allege that they conferred a benefit on WGH when they provided 'valuable and sensitive medical information.'" (ECF No. 27, at p. 29).[11] However, allegations substantially similar to Plaintiffs' have consistently been found to sufficiently state a

---

[11] WGH also argues that Plaintiffs "have not alleged that any of their payment for care as patients went towards getting data privacy and security." (ECF No. 27, at p. 29). However, such an allegation can certainly be reasonably inferred from Plaintiffs' allegations that they "would have paid less for WGH's services [had they known that WGH] would collect, use, and disclose their Private Information to third parties," and that they "suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that [Plaintiffs] paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received." (ECF No. 19, at ¶¶ 252, 254).

claim of unjust enrichment at the pleading stage. See, e.g., Murphy, 2024 WL 4350328, at *7 (finding that plaintiffs plausibly pleaded that, by receiving plaintiffs' IIHI and disclosing it to Meta to tailor advertisements related to plaintiffs' medical needs or status as a patient of defendant, defendant may have received the benefit of this targeted advertisement"); Doe v. Tenet Healthcare Corp., 731 F.Supp.3d 142, 151 (D. Mass. 2024) (finding plaintiff's allegations that her Private Information conferred a benefit on defendant because it was valuable marketing information to third parties, and that she paid for medical services from defendant with the expectation that her health information would remain confidential and not disclosed for defendant's benefit, "plausibly suggest that defendant retained a measurable benefit and that the retention of that benefit was unjust"); Lugo v. Inova Health Care Services, 2025 WL 905191, at *5 (E.D. Va. Mar. 25, 2025) ("Taking Plaintiff's allegations as true, Plaintiff has plausibly stated facts to show he conferred a benefit on [defendant] by providing [defendant] with his personal data for which [defendant] was later compensated by Google and Facebook"); W.W. v. Orlando Health, Inc., 2025 WL 722892, at *10 (M.D. Fla. Mar. 6, 2025) ("The court agrees that private information, at least in the context of sensitive medical information, has value"); Nienaber, 2025 WL 692097, at *11(confirming that "the provision of any PHI to defendant would be sufficient to confer a benefit").

Based on the foregoing, WGH's motion to dismiss Plaintiff unjust enrichment claim will be denied.

### H.    Breach of Fiduciary Duty

"'To establish breach of a fiduciary duty in Pennsylvania, the claimant must show: (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters ...; (2) that the plaintiff suffered injury; and (3) that the agent's failure to

22

act solely for the plaintiff's benefit was a real factor in bringing about plaintiff's injuries.'" Zimmerman, 780 F.Supp.3d at 604, quoting Opris, 2022 WL 1639417, at *10 (cleaned up). Pennsylvania recognizes a fiduciary duty where there is a confidential relationship and the parties "do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." Id. (quotation omitted). "'But the mere receipt of confidential information is insufficient by itself to transform an arm's-length transaction into a fiduciary relationship.'" Id., quoting Weinberg v. Advanced Data Processing, Inc., 147 F. Supp. 3d 1359, 1367 (S.D. Fla. 2015) (collecting cases).

Here, Plaintiffs allege, *inter alia*, that WGH breached the fiduciary duty that it owed to [Plaintiffs] by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, their Private Information." (ECF No. 19, at ¶ 259). According to Plaintiffs, this duty arose from the relationship they had with WGH, in which they "put their trust in [WGH] to protect the Private Information of [Plaintiffs], and [WGH] accepted that trust." (Id. at ¶ 258).

Although WGH aptly contends that "[v]isiting a website alone cannot create a fiduciary relationship," it appears to concede that the named Plaintiffs' status as patients of WGH conferred upon WGH a special confidence. (ECF No. 27, at p. 30). Yet, WGH contends that "even for those Plaintiffs who are or were WGH patients, no allegations establish breach." (Id.). In support of this contention, WGH, once again, falls back on its argument that "the Amended Complaint here at most discusses website usage data." (Id. at 30-31). As the Court has noted repeatedly, this argument is unavailing. WGH also attempts to draw a distinction between the facts in Opris, which dealt with "a significant data breach by hackers" and the current case, which deals with "an ordinary website functionality technology like the Pixel," as if the former is

23

somehow a much more egregious breach of confidence than the latter. (Id. at p. 31). This distinction is nonsensical. WGH's motion to dismiss this claim will be denied.

## I.    UTPCPL

"To establish liability under the UTPCPL, a party must prove: '(1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss.'" Opris, 2022 WL 1639417, at 12, quoting Slapikas v. First Am. Title Ins. Co., 298 F.R.D. 285, 292 (W.D. Pa. 2014).

Here, WGH contends that "there are no allegations about how WGH 'deceived' Plaintiffs or otherwise violated the law, only legal conclusions" (ECF No. 27, at p. 31); however, this is a blatant distortion of Plaintiffs' allegations. As Plaintiffs aptly summarize in their opposition brief, Plaintiffs allege that WGH "deceptively encouraged its patients to use its website, representing that communicated information was confidential, while simultaneously breaking that confidentiality by selling patient information" to third parties. (ECF No. 30, at p. 36, citing ECF No. 19, at ¶¶ 7, 38, 71-77, 108-09, 117, 122, 127, 132, 239). The Court finds these allegations sufficient at the pleading stage to establish both a "deceptive act … likely to deceive" and "justifiable relance" on the part of Plaintiffs.

A more cogent issue raised by WGH is whether Plaintiffs have sufficiently alleged an "ascertainable loss" under the UTPCPL. WGH argues that Plaintiffs have failed to do so, contending that "[t]here are no allegations of 'actual loss of money or property,' which 'must be identifiable' and 'cannot be speculative.'" (ECF No. 27, at p. 32, quoting Opris, 2022 WL 1639417 at *13). In this regard, WGH contends that "there are no allegations that Plaintiffs bought … 'credit monitoring and identity theft detection services'" like the plaintiffs alleged in

24

Opris, nor that they lost any money taking remedial actions to "deal[] with the data collected as in Rutter [511 F.Supp.3d at 54]." (Id.). However, this contention conveniently overlooks Plaintiffs' allegations that they lost the property value of their Private Information, which "serves as another form of lost property" found to be sufficient for purposes of alleging an ascertainable loss under the UTPCPL. Opris, 2022 WL 1639417 at *13.

Thus, WGH's motion to dismiss Plaintiff's UTPCPL claim will be denied.

## J.    WESCA

Pennsylvania's WESCA provides "'[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used'" in violation of the statute [shall have] a private right of action against "any person who intercepts, discloses or uses" those communications. Popa v. Harriet Carter Gifts, Inc., 52 F.4th 121, 125 (3d Cir. 2022), quoting 18 Pa. C.S. § 5725(a). To establish a violation of WESCA, a plaintiff must show:

> '(1) that [the claimant] engaged in a communication; (2) that he possessed an expectation that the communication would not be intercepted; (3) that his expectation was justifiable under the circumstances; and (4) that the defendant attempted to, or successfully intercepted the communication, or encouraged another to do so.'

Emmett v. Delta Air Lines, Inc., 2024 WL 2816502 at *7 (W.D. Pa. June 3, 2024), citing Kelly v. Carlisle, 622 F.3d 248, 257 (3d Cir. 2010) (quoting Agnew v. Dupler, 717 A.2d 519, 522 (Pa. 1998)).

WGH moves to dismiss Plaintiffs' WESCA for several reasons. First, WGH argues that "in order for someone to be held liable under [WESCA], the *contents* of the communications must have been intercepted," which Plaintiffs have failed to allege. (ECF No. 27, at pp. 35-36) (emphasis in original). However, as the Honorable Robert J. Colville has noted in two recent cases involving substantially similar claims under WESCA:

25

there is a viable cause of action under [WESCA] that does not require the interception of the 'contents' of a communication. Plaintiff brings this action under 18 Pa. Const. Stat. §§ 5703(1)–(3). 18 Pa. Const. Stat. § 5703(1) creates a cause of action against one who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication." **No mention of content here, and this alone would provide Plaintiff with a viable cause of action under the PWA.**

Emmett, 2024 WL 2816502 at *8; Schnur v. JetBlue Airways Corp., 2024 WL 2816552, at *9 (W.D. Pa. June 3, 2024). As in Emmett and Schnur, Plaintiffs' WESCA claim is primarily based on Section 5703(1) of the Act (ECF No. 19, at ¶ 280), and, thus, does not require the interception of "contents" to state a viable claim. Moreover, even if allegations of "contents" were required, the Court adopts the reasoning of the Middle District Court in Doe v. Post Acute Medical, LLC, 2025 WL 511069 (M.D. Pa. Feb. 14, 2025), which found that "the acquisition of 'at least some content' may be properly inferred from a complaint that includes facts plausibly demonstrating 'a broad scheme in which the defendant[] generally acquired and tracked the plaintiffs' internet usage.'" Id. at *5, quoting In re Google Cookie Placement Consumer Priv. Litig., 806 F.3d 125, 139 (3d Cir. 2015); see also Oliver v. Noom, 2023 WL 8600576, at *7 (Aug. 22, 2023) ("Plaintiffs allege that [tracking software] records *all website visitor actions*[,] which necessarily includes all of the information input .... At this stage, these allegations are sufficient to establish that [the defendant] intercepted contents of [the p]laintiff['s] communications") (emphasis added) (internal quotations and citations omitted).

WGH's second basis for dismissal of Plaintiffs' WESCA claim is that the Meta Pixel is a computer code and "not a 'device' under the statute because it is not physical or tangible." (ECF No. 27, at p. 37). In fact, WGH asserts that "no Pennsylvania court has interpreted the Meta Pixel or similar kind of computer code to constitute a device under [WESCA] (Id.); however, in both

26

Emmett and Schnur, the court did, indeed, find that similar tracking software falls within the Act's definition of "device." Both of those cases involved tracking software known as "Session Replay Code," which is described as a computer code that "enables website operators to record, save, and replay website visitors' interactions with [the] website[, providing] online marketers and website designers with insights into the user experience by recording website visitors 'as they click, scroll, type or navigate across different web pages.'" Schnur, 2024 WL 2816552, at *1. In addressing defendant's argument in both cases that the Session Replay Code is not an intercepting "device" under WESCA, the court aptly noted:

> as a practical matter, software does not operate independently of hardware. Not only is Plaintiff's computer or mobile phone, which facilitated the connection to Defendant's website, a "device," but the Session Replay Code itself operates on a remote computer or server controlled by Defendant. It is hard to imagine that software installed on a user's phone that intercepts phone conversations would not fall under the category of "device" for [WESCA] purposes, and the Court fails to see why it should be any different for internet communications. Accordingly, the Court finds that the Session Replay Code, or Defendant's remote hardware that operates the Session Replay Code, is a device that intercepts under the meaning of [WESCA].

Emmett, at *9; Schnur at *9.[12] See also Noom, 2023 WL 8600576, at *6 (finding that "[a]s pled, the Session Replay Code used by [defendant] could reasonably be considered 'a device or apparatus' that can be used to intercept a transfer of data" under WESCA).

---

12

Although WGH acknowledges these decisions in a footnote, it argues that this Court "need not follow" them because they are "factually distinguishable and non-binding, unpublished cases." (ECF No. 27, at p. 39 n. 18). While the Court agrees that it is not bound to follow these decisions and that the overall facts of both cases are not on all fours with the facts in the present case, the Court finds the above-quoted finding in both cases to be highly relevant and persuasive with regard to the issue of whether a computer code similar to the Meta Pixel is a "device" under WESCA.

The Court adopts the reasoning of the foregoing cases and finds that Plaintiffs have sufficiently pleaded that the Meta Pixel embedded on WGH's website was an intercepting "device" within the meaning of WESCA.[13]

In addition to the foregoing arguments challenging the elements of Plaintiffs' WESCA claim, WGH argues that dismissal of the claim is required by the rule of lenity. The rule of lenity may apply in civil cases when the statute invoked has criminal applications. United States v. Thompson/Ctr. Arms Co., 504 U.S. 505, 518 n.10 (1992). Such is the case here, as WESCA makes violation of its criminal section a felony of the third degree, 18 Pa. C.S. § 5703, and key terms like "device" and "intercept" apply to both its civil and criminal provisions. Thus, according to the rule of lenity, "any ambiguities in the statute should be interpreted strictly and consistently in both the criminal and the civil context," and "ambiguity is resolved in favor of the defendant, which in this case means that the statute should be construed to cover only those who plainly fall within the text." Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr., 703 Fed. Appx. 126, 131 (3d Cir. 2017).

Here, WGH contends that, because no one has been criminally prosecuted under WESCA for using the Meta Pixel, the rule of lenity "commands restraint" with regard to Plaintiffs' "vastly overbroad and dramatic reading" of the statute. The Court is not inclined to apply such restraint, particularly at the pleading stage. As the court noted in Howard v. Laboratory Corp. of America, 2024 WL 4250677 (M.D. N.C. Aug. 8, 2024) when faced with a similar argument regarding the civil application of a statute substantially similar to WESCA,

---

13

Because this finding comports with findings previously issued by other courts within this district, WGH's "absurdity canon" argument is toothless.

> [F]ederal courts have routinely applied [statutes like WESCA] to similar scenarios or, at a minimum, have engaged with the statutes under the assumption that they applied to private parties in civil suits. Thus, for purposes of a Motion to Dismiss, Plaintiffs' similar allegations fall, at least facially, within the reasonable scope of the statutes and there is therefore no reason to find that the rule of lenity categorically bars such private causes of action.

Id. at *8.[14]

Based on the foregoing, therefore, WGH's motion to dismiss Plaintiffs' WESCA claim will be denied at this early stage of the proceeding.

An appropriate Order follows.

---

[14] WGH's further contention that Plaintiffs have pleaded insufficient facts to support a claim under WESCA deserves no consideration, as it merely reiterates arguments that have already been addressed repeatedly, and its final argument that the Court should dismiss the WESCA claims of any class members who may have accessed WGH's website from outside of Pennsylvania is considered premature at this stage of the proceeding.